**Chester Wheeler CAMPBELL, Plaintiff-Appellant,**

v.

**Joseph SHEARER, et al., Defendants-Appellees.**

No. 82–1665.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 25, 1983.

Decided April 24, 1984.

Rehearing and Rehearing En Banc Denied July 2, 1984.

Patmon, Young & Kirk, Detroit, Mich., Carol Evans (argued), Detroit, Mich., for plaintiff-appellant.

Thomas Gallagher (argued), Gary Kress (argued), Detroit, Mich., for defendants-appellees.

Before LIVELY, Chief Judge, MERRITT, Circuit Judge and HOLSCHUH, District Judge.[*]

MERRITT, Circuit Judge.

In this procedural due process action brought under 42 U.S.C. § 1983 (1976) for deprivation of property, we are presented again with the question of what elements are necessary to state and prove a cause of action for constitutional deprivation of property under section 1983. The District Court decided in favor of the various defendants on grounds that they are protected from liability by either an absolute, or a qualified immunity. We affirm on a different ground. Under our recent decision in *Vicory v. Walton*, 721 F.2d 1062 (6th Cir. 1983), a plaintiff must plead and prove that available state remedies are inadequate or systemically defective in order to state or prove a proper procedural due process claim under section 1983 for deprivation of property. Plaintiff must prove the due process element of the wrong as well as the property deprivation element, and in this case he has failed to show that Michigan's administrative and judicial remedies are inadequate or that they do not provide adequate process to remedy the constitutional violation claimed.

## I.

Plaintiff, who is currently incarcerated, filed this section 1983 action alleging that his due process rights were violated when Detroit police officers seized approximately $280,100 in cash from his home pursuant to a warrant that authorized them to search for weapons, drugs, drug paraphernalia, and other evidence of drugs. Upon the issuance of a jeopardy tax assessment by the Michigan Department of Treasury, the Detroit Police Department surrendered $127,775.38 to the state tax collectors. The remaining cash was apparently turned over to the Internal Revenue Service under a federal jeopardy tax assessment.

Soon thereafter, a judge of the Recorder's Court for the city of Detroit held that the seizure of the money was illegal because it was not within the scope of the search warrant. Plaintiff then filed a request with the Michigan Department of Treasury for an informal hearing concerning the assessment. A series of bureaucratic or procedural impediments then arose.

Pursuant to plaintiff's request, the Department scheduled a hearing. Before it held the hearing, the Department determined that it lacked jurisdiction. Since plaintiff had relied upon an earlier departmental practice of allowing informal hearings in such tax assessment matters, however, the Department indicated that plaintiff would be allowed thirty days to bring a

[*] The Honorable John D. Holschuh, Judge of the United States District Court for the Southern District of Ohio, sitting by designation.

proper appeal before the Michigan Board of Tax Appeals.

Approximately one week later, plaintiff filed an appeal with the Board of Tax Appeals. The Michigan Attorney General moved to dismiss the appeal because it had not been filed within the statutorily required thirty days of the actual assessment. The Board granted the Attorney General's motion, dismissing the appeal for lack of jurisdiction, while noting that the dismissal "works an unconscionable result and an obvious deprivation of fundamental due process."

Plaintiff thereupon filed a mandamus action in the Michigan Court of Appeals, seeking to compel the Michigan Department of Treasury to return the money seized under the jeopardy sales tax assessment and to compel the Board of Tax Appeals to hold a hearing on the assessment. The Michigan Court of Appeals issued a writ of mandamus remanding the case to the Board for a hearing. The Board held that the jeopardy assessment issued by the State of Michigan against plaintiff was valid but declined to rule whether statutory procedures were violated because it said that it lacked equitable power to grant injunctive relief. *See Campbell v. Department of Treasury*, 77 Mich.App. 435, 258 N.W.2d 508 (1977).

Plaintiff never appealed the Board's decision. Even before the Board had rendered its decision, plaintiff filed this action in the District Court. Plaintiff alleged that the defendants, while acting under color of state law, caused him to be deprived of constitutional rights guaranteed under the fourth and fourteenth amendments (1) by illegally seizing his property under the jeopardy sales tax assessment without affording him an administrative or Board of Tax Appeals hearing; and (2) by wrongfully depriving him of a post-seizure administrative hearing to protest the jeopardy assessment in accordance with state practice and procedure. Defendants are five Detroit police officers, the city of Detroit, the state Revenue Commissioner, a hearing officer of the Michigan Department of Trea-

sury, and four agents of the Michigan Department of Treasury, Intelligence Unit. The defendants connected with the city of Detroit, called the "city defendants," failed to answer plaintiff's complaint, and consequently the clerk of the District Court entered default judgments against them. After a hearing on the morning of trial, the District Court ruled that excusable neglect caused the city defendants' failure to answer, and therefore set aside the defaults. Following the jury trial, the District Court directed a verdict in favor of the city defendants, and granted a summary judgment for the remaining state defendants, on grounds that either an absolute or qualified immunity from liability under section 1983 covered all of the defendants.

## II.

This case is closely analogous to the situation we addressed recently in *Vicory v. Walton*, 721 F.2d 1062 (6th Cir.1983). In *Vicory*, the plaintiff brought a due process action under 42 U.S.C. § 1983 complaining that he had been deprived of property, a mobile home trailer seized as evidence in a state trial. The District Court granted a summary judgment on immunity grounds against defendants, the prosecutor and sheriff who had seized plaintiff's trailer. On appeal, we held under the authority of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), that in section 1983 damage suits for deprivation of property without procedural due process, the plaintiff has the burden of pleading and proving that state damage remedies are inadequate to redress the alleged wrong. The plaintiff in *Vicory* failed to meet this burden, because forcible entry and detainer or small claims actions were available in Ohio courts which could have redressed the alleged wrong.

Similarly, the plaintiff here failed to allege any deficiency in the state's corrective procedures. Michigan law provides for an appeal from adverse decisions of the state Board of Tax Appeals. *See* Mich.Comp. Laws Ann. § 205.22 (West 1983) (as amended, original version at Mich.Comp.Laws

Ann. § 205.9 (West 1967)). An aggrieved taxpayer can file a claim for recovery in the state court of claims. If the court of claims' decision is also adverse, plaintiff may appeal to the Michigan Supreme Court. *See id.*

Furthermore, in addition to this procedure, the statutes providing for jeopardy tax assessment have been interpreted by the Michigan Supreme Court to allow an aggrieved taxpayer to commence an immediate action in the circuit court of the county where he resides. *See Craig v. City of Detroit,* 397 Mich. 185, 243 N.W.2d 236 (1976). Although the Supreme Court in *Laing v. United States,* 423 U.S. 161, 96 S.Ct. 473, 46 L.Ed.2d 416 (1976),[1] had held that access to a post-seizure hearing within sixty days was sufficient to satisfy the requirements of due process, the Michigan court in *Craig* hinted that a review procedure which allowed a hearing within sixty days "is not in our opinion a prompt post-seizure hearing" because a decision might not be forthcoming until the ninety-fifth day after the taxpayer had filed his appeal. 397 Mich. at 189–90 n. 5, 243 N.W.2d at 238 n. 5. The *Craig* court did not go so far as to say that this appeal procedure violates due process, however. Rather, it held that "[a]ssuming that seizure has injured a taxpayer in a way that could not be adequately remedied by a judgment in a refund suit,

and assuming that there is no basis in fact for the assessment," the taxpayer need go no further than the circuit court of the county of his residence to challenge the departmental finding that an act tending to jeopardize collection has been made or is about to be committed. *Id.* at 191, 243 N.W.2d at 239. *Craig* was decided after the jeopardy assessment in this case was issued, but well before plaintiff initiated his section 1983 action. Therefore, it was open to plaintiff to file in Wayne County Circuit Court for a post-seizure hearing to test his federal constitutional claims asserted under section 1983 as well as his state claims.

Plaintiff's remedies under Michigan law are clearly adequate. He is therefore unable to satisfy the "due process" element of his 1983 claim, the requirement that he show the existence of a procedural deficiency in state law or a systemic problem with the state's corrective process. Accordingly, the judgment of the District Court is affirmed.[2]

HOLSCHUH, District Judge, dissenting.

I respectfully dissent for two basic reasons. First, the majority's conclusion that the plaintiff's action against the state defendants was insufficient to state a section 1983 claim is based upon a very expansive interpretation of *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420

1. In *Laing,* the Supreme Court held that the procedural safeguards required in federal jeopardy tax assessment cases are: (1) taxpayer access to the Tax Court within sixty days of the jeopardy assessment; (2) taxpayer ability to stay collection of the amount assessed by posting an equivalent bond; and (3) prohibition on sale of any property seized pending final determination of the deficiency by the Tax Court. 423 U.S. at 170–71, 184, 96 S.Ct. at 479, 485.

2. To the extent that the dissenting opinion is correct in asserting that the plaintiff is making a fourth amendment claim against the Detroit police officers independent of his procedural due process claim, this fourth amendment claim can only refer to the seizure of property, namely cash, not to a seizure or deprivation of the person as in *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 481, 5 L.Ed.2d 492 (1961). To the extent that the plaintiff is making such an independent property claim under the fourth

amendment, it is without merit. The police officers were unable, as ordered by the state Recorder's Court, to return the cash seized under the state search warrant because, in the meantime, both the federal and the state governments had issued jeopardy tax assessments seizing the money. The police officers had lost control of the money to the taxing authorities and could not return it. The police officers may not be held liable for the intervening, superseding seizure of the money by taxing authorities, conduct which prevented the officers from returning the money in accordance with the decision of the Recorder's Court. From the point of view of the city police officers, return of the money became an impossibility. Hence the complaint does not state a valid claim against the police officers under the fourth amendment. The case turns therefore on the answer to the procedural due process claim discussed above in the main body of the opinion.

(1981), an interpretation that would virtually eliminate, in my view, all section 1983 claims for deprivation of property without procedural due process. Second, the majority opinion does not distinguish between plaintiff's claims against the state defendants and plaintiff's claims against the city defendants, and I believe the respective claims rest upon significantly different applications of Fourteenth Amendment rights. Before considering these different claims, however, it is necessary to review in some detail the factual background that gave rise to plaintiff's action in the District Court.

## I.

While plaintiff was incarcerated following his arrest for possession of a concealed weapon, Detroit police officers obtained a warrant to search plaintiff's residence. On February 6, 1975, after breaking down the door of the residence, they conducted a search of the premises and seized certain documents, papers and records, together with $280,100 in cash. The Intelligence Unit of the Michigan Department of Treasury was promptly notified of this find, and officials of that Department, on February 28, 1975, issued a jeopardy sales tax assessment in the amount of $314,304.90. The assessment and a notice of levy were served on plaintiff at the Oakland County jail on March 3, 1975, and the Detroit police officers and the Oakland County Prosecutor's Office surrendered to Department agents money in the amount of $127,-775.38.[1] This amount reflected the balance of the funds seized from plaintiff's house following a similar assessment and levy by the Internal Revenue Service.[2]

On March 7, 1975, in an action brought by plaintiff in the Recorder's Court for the City of Detroit, Judge Leonard of that court held that the officers executing the search warrant had exceeded their legal authority in the execution of the warrant by seizing property and money not speci-

fied in the warrant and ordered the Detroit Police Department, the Wayne County Organized Crime Task Force, Det. Sgt. Michael DeCamille, Det. Sgt. James Mezzone, Det. Sgt. Vincent Browe and Det. Sgt. Royden Awe to return to the plaintiff all money seized during the search. At this point, however, the Detroit Police Department no longer possessed the money, having surrendered it to state and federal taxing authorities. Plaintiff then attempted to recover from the Michigan Department of Treasury the money seized by that Department under Michigan's jeopardy assessment statutes and encountered what the majority describes as "[a] series of bureaucratic or procedural impediments." That description is indeed an understatement of the extraordinary difficulty plaintiff encountered in attempting to challenge the validity of the jeopardy assessment through the state's administrative and judicial procedures.

On March 25, 1975, plaintiff sent the Department of Treasury a request for an informal hearing concerning the assessment. On April 1, 1975, a Department referee sent plaintiff a form letter stating that the request for a hearing was timely. The form letter described the appeal process for an "intent to assess" procedure and advised plaintiff to ignore any subsequent assessment based on the "intent to assess." A hearing was scheduled pursuant to plaintiff's request but was repeatedly adjourned over plaintiff's objections. On July 11, 1975, the Revenue Commissioner issued an Order of Determination that indicated it had been departmental practice to grant informal hearings in jeopardy assessment matters as well as in cases involving an intent to assess, but, upon advice of the state Attorney General, the Commissioner ruled there was no statutory jurisdiction for a departmental hearing in a jeopardy assessment case. In view of the fact that plaintiff had relied upon the practice of the Department to grant such hearings, the

---

**1.** *Campbell v. Dept. of Treasury,* 77 Mich.App. 435, 258 N.W.2d 508 (1977).

**2.** The validity of the jeopardy assessment by the Internal Revenue Service is not involved in this appeal.

Commissioner held that plaintiff would be allowed thirty days to file an appeal with the Board of Tax Appeals.

Plaintiff filed an appeal with the Board of Tax Appeals within the thirty day period, but the Attorney General then moved to dismiss the appeal because it had not been filed, as required by statute, within thirty days of the actual assessment. On October 23, 1975, the Board dismissed the appeal for "lack of jurisdiction and equitable power," acknowledging that the dismissal "works on unconscionable result and an obvious deprivation of fundamental due process." [3]

Plaintiff then turned to the Michigan courts for relief. In an action filed in the Court of Appeals of Michigan he sought a writ of mandamus compelling the Department of Treasury to return the money to him or compelling the Department of Treasury to hold a hearing concerning the assessment. On August 22, 1977, that court declined to order the money returned but did issue a writ of mandamus compelling the Board of Tax Appeals to hold a hearing, noting that "it would be highly inequitable to now victimize plaintiff because the departmental practice was changed in midstream...." [4] The court of appeals ordered that the hearing be held within sixty days and concluded with the statement, "we retain jurisdiction." [5]

The Board of Tax Appeals then held a hearing and concluded in its decision of October 30, 1978, that the assessment was not arbitrary and capricious and that it was not the exaction of a penalty under the guise of a tax. The Board, however, declined to make any decision on the issue of alleged violations of statutory procedures by the Department of Treasury in making the jeopardy assessment, described by the Board as plaintiff's "most potent argument," [6] for the reason that under its limited statutory authority it lacked jurisdiction

to issue any injunctive relief even if the statutes had been violated.

Plaintiff returned to the court of appeals that had issued the writ of mandamus and had retained jurisdiction of the case. On December 7, 1979, that court refused to set aside or modify the Board's decision, and, with respect to the issue the Board had declined to decide, the court found plaintiff's position to be without merit. Subsequently, however, on plaintiff's application for rehearing, the same court of appeals concluded on July 3, 1980, that it had been in error in retaining jurisdiction after issuance of the writ of mandamus and that its decision of December 7, 1979, "was improvidently rendered." The mandamus decision was amended to delete the sentence "we retain jurisdiction," and the decision of December 7, 1979, was "rescinded and of no further force and effect." [7]

After five years, the net result of plaintiff's efforts in the state's administrative and judicial systems was a hearing before the Board of Tax Appeals which declined, for lack of jurisdiction to grant relief, to decide at least one of the issues raised by plaintiff concerning the validity of the jeopardy assessment. In the meantime, plaintiff had turned to the federal court for relief.

## II.

The Complaint filed by plaintiff in the District Court for the Eastern District of Michigan on February 25, 1977, named three groups of defendants: the "federal defendants," consisting of the District Director of the Internal Revenue Service and certain agents of the Service, the "state defendants," consisting of the Revenue Commissioner of Michigan and certain agents of the Michigan Department of Treasury, and the "city defendants," consisting of the Detroit police officers who were involved in the search of plaintiff's residence and who had been ordered by the

---

**3.** *Campbell,* 258 N.W.2d at 509.

**4.** *Id.* at 511.

**5.** *Id.* at 512.

**6.** Joint Appendix 235.

**7.** Joint Appendix 241.

Recorder's Court to return to plaintiff the money illegally seized during that search. Plaintiff brought the action pursuant to 42 U.S.C. §§ 1983 and 1985(3), seeking from all defendants compensatory and punitive damages.

On October 4, 1978, the District Court granted the federal defendants' motion for summary judgment and also dismissed plaintiff's claims under section 1985.[8] The case proceeded against the state and city defendants on the section 1983 claims. On June 28, 1982, the District Court granted the state defendants' motion for summary judgment, and on August 19, 1982, the District Court, at the conclusion of plaintiff's evidence in the trial of the city defendants, directed a verdict in favor of the city defendants.

Plaintiff appeals both the summary judgment rendered in favor of the state defendants and the judgment rendered in favor of the city defendants on their motion for a directed verdict. Although the District Court decided in favor of both groups of defendants on immunity grounds, the facts, issues and constitutional rights asserted by plaintiff are substantially different for each group of defendants. Each of the judgments on appeal, therefore, must be considered separately with respect to whether plaintiff had made a proper section 1983 claim against each group of defendants, an issue not raised in the lower court but raised and decided by the majority of this panel. Each judgment must also be considered separately with respect to whether each group of defendants was entitled to immunity, an issue decided in the lower court but not discussed or decided by the majority of this panel. I examine first the plaintiff's section 1983 claims against the state defendants, because the focus of

the majority opinion is on the sufficiency of those claims.

### III.

Among the plaintiff's claims against the state defendants is his claim that those defendants, acting under color of state law, wrongfully seized his money under state jeopardy assessment statutes and did not provide plaintiff with a prompt post-seizure hearing, thus depriving him of his property without due process of law. In addition, plaintiff claims he was denied equal protection of the laws, a claim apparently based on the fact the Department of Treasury had denied plaintiff the departmental hearing that had been granted other taxpayers confronted with such seizures. The District Judge did not specifically address these issues, because he concluded that the state defendants were entitled to summary judgment on immunity grounds. He also concluded that because plaintiff had the opportunity to raise these constitutional issues in his state court actions and before the state administrative agencies he was precluded from relitigating them in the federal court action.[9]

### A.

The majority affirms the judgment below, as it states, "on a different ground," namely, that on the authority of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and *Vicory v. Walton*, 721 F.2d 1062 (6th Cir.1983), plaintiff cannot satisfy the due process element of his section 1983 procedural due process claim, because Michigan's "corrective procedures" were available to him and his remedies under Michigan law are "clearly adequate." The majority holds that to satisfy the due process element of a section 1983

---

**8.** The summary judgment in favor of the federal defendants was affirmed by this Court by Order dated June 29, 1981. The dismissal of the section 1985(3) claims is not an issue in the present appeal.

**9.** The District Court did not consider, nor did the parties raise in that Court or on this appeal, the possible application of *Fair Assessment in Real Estate Ass'n. v. McNary*, 454 U.S. 100, 102

S.Ct. 177, 70 L.Ed.2d 271 (1981), in which the Supreme Court held that "[d]espite the ready access to federal courts provided by *Monroe* and its progeny, we hold that taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts." 454 U.S. at 116, 102 S.Ct. at 186.

claim, a plaintiff who alleges a deprivation of property by a violation of procedural due process must "show the existence of a procedural deficiency in state law or a systemic problem with the state's corrective process." I believe that such a broad requirement, uniformly applied to *all* such section 1983 cases, extends *Parratt* beyond its permissible limits, is contrary to *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and its progeny, and would effectively eliminate section 1983 actions based upon a deprivation of property without procedural due process.

*Parratt* involved the loss of a prisoner's property as a result of the negligence of state employees. Plaintiff's sole claim was based upon a denial of procedural due process. Recognizing that "[o]ur past cases mandate that some kind of hearing is required at some time before a State finally deprives a person of his property interests," 451 U.S. at 540, 101 S.Ct. at 1915, the *Parratt* Court pointed out that due process does not always require that the hearing take place before the initial deprivation occurs. *Parratt* fell within the category of cases in which it was impracticable or impossible for the state to provide any predeprivation hearing because it involved a "random and unauthorized act by a state employee." 451 U.S. at 541, 101 S.Ct. at 1916. As the Court pointed out,

> [i]n such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as action under "color of law," is in almost all cases beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation. That does not mean, of course, that the State can take property without providing a meaningful post-deprivation hearing. The prior cases which have excused the prior-hearing requirement have rested in part on the availability of some

meaningful opportunity subsequent to the initial taking for a determination of rights and liabilities.

451 U.S. at 541, 101 S.Ct. at 1916.

Unlike *Parratt*, the present case does not involve "a random and unauthorized act by a state employee" under circumstances in which "the State cannot predict precisely when the loss will occur." To the contrary, the present case involves the deliberate taking of plaintiff's property by state officials under an established state procedure in which the state could easily have provided a hearing process sufficient to meet the requirements of due process. In *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), plaintiff's property (his claim under the Illinois Fair Employment Practices Act) was taken from him by virtue of the state's statutes that eliminated his claim, without notice, as a result of the failure of a state agency to convene a timely conference on his claim. In distinguishing *Parratt*, the Court emphasized that in *Parratt* it was dealing with,

> "a tortious loss of . . . . property as a result of a random and unauthorized act by a state employee . . . not a result of some established state procedure." 451 U.S., at 541, 101 S.Ct. at 1916. Here, in contrast, it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference—whether the Commission's action is taken through negligence, maliciousness, or otherwise. *Parratt* was not designed to reach such a situation. See *id.*, at 545, 101 S.Ct. at 1917 (second concurring opinion). Unlike the complainant in *Parratt*, Logan is challenging not the Commission's error, but the "established state procedure" that destroys his entitlement without according him proper procedural safeguards.

455 U.S. at 435–36, 102 S.Ct. at 1157–58.

The reference in *Logan* to the second concurring opinion in *Parratt* was to that of Mr. Justice Blackmun who said,

[w]hile the "random and unauthorized" nature of negligent acts by state employees makes it difficult for the State to "provide a meaningful hearing before the deprivation takes place," *ante,* at 541 [101 S.Ct. at 1916], it is rare that the same can be said of intentional acts by state employees. When it is possible for a State to institute procedures to contain and direct the intentional actions of its officials, it should be required, as a matter of due process, to do so. See *Sniadach v. Family Finance Corp.,* 395 U.S. 337 [89 S.Ct. 1820, 23 L.Ed.2d 349] (1969); *Fuentes v. Shevin,* 407 U.S. 67 [92 S.Ct. 1983, 32 L.Ed.2d 556] (1972); *Goldberg v. Kelly,* 397 U.S. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287] (1970). In the majority of such cases, the failure to provide adequate process prior to inflicting the harm would violate the Due Process Clause. The mere availability of a subsequent tort remedy before tribunals of the same authority that, through its employees, deliberately inflicted the harm complained of, might well not provide the due process of which the Fourteenth Amendment speaks.

451 U.S. at 546, 101 S.Ct. at 1918.

Thus, as I read *Parratt* and *Logan,* when a person is deprived of property as a result of a random and unauthorized act of a state employee, as opposed to an act taken in accordance with an established state procedure, that person may be required, in order to state a section 1983 claim, to demonstrate that available state remedies are inadequate to redress the alleged wrong. The *Parratt* Court explicitly distinguishes that type of case from cases such as the present one in which the deprivation is the direct result of a statutory scheme deliberately put in place by the state. *Parratt,* 451 U.S. at 543, 101 S.Ct. at 1916; *accord Logan,* 455 U.S. at 436, 102 S.Ct. at 1158. In this situation the state—as a part of that established procedure—*must* provide hearing safeguards sufficient to satisfy due process. Nothing in *Parratt* requires a person deprived of property as a result of actions taken by state officials under an established state procedure to demonstrate—in order to state a section 1983 claim—that state damage remedies are inadequate to redress the alleged wrong.

As Mr. Justice Blackmun observed in *Parratt,* in the majority of cases in which a person's property is taken by the state under an established state procedure, the failure to provide adequate process prior to inflicting the harm would violate the due process clause. This is not true, of course, in all cases. It is clear that in some situations a state may deprive a person of property, even under an established state procedure, without a prior hearing, if the necessity for quick action or the necessity to protect an important governmental or public interest is involved *and* the state has provided in conjunction with the deprivation a meaningful postdeprivation hearing. Although the present case involves an established state statutory procedure, seizures pursuant to jeopardy assessments are necessary to protect an important governmental interest, and a special need exists for very prompt action. *Laing v. United States,* 423 U.S. 161, 187, 96 S.Ct. 473, 487, 46 L.Ed.2d 416 (1976) (Brennan, J., concurring). Therefore, a state may, without providing a predeprivation hearing, seize a taxpayer's property under such a statutory procedure if, but only if, that procedure also provides for a prompt postdeprivation hearing—one that is meaningful not only in point of time but also in the manner in which it is held. *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).

This, of course, is the precise constitutional issue raised by plaintiff in his section 1983 action, namely, his claim that Michigan taxing authorities seized his property under that state's jeopardy assessment statutes without providing him with the prompt postdeprivation hearing required by due process. In *Laing,* statutory construction made it unnecessary to reach this due process question, 423 U.S. at 184 n. 26, 96 S.Ct. at 485 n. 26, but in the view of at least one Justice a sixty-day delay after a jeopardy assessment before obtaining ac-

cess to the Tax Court was a denial of due process, 423 U.S. at 187–88, 96 S.Ct. at 487 (Brennan, J., concurring). It is clear that in 1976 the Michigan Supreme Court was concerned about the issue of whether the Michigan statutes in question—in their provisions for appeal to the Board of Tax Appeals—provided for the constitutionally required prompt postseizure hearing. As a result of that concern, the Michigan Supreme Court in *Craig v. City of Detroit Police Department*, 397 Mich. 185, 243 N.W.2d 236 (1976), judicially created another forum for the taxpayer—an action in the circuit court of the taxpayer's residence—provided the taxpayer could show the existence of irreparable injury and the lack of a factual basis for the assessment. It should be noted, of course, that this remedy did *not* exist in Michigan when plaintiff's property was seized by the state taxing authorities.

A court called upon to decide the constitutional issue raised by plaintiff in this case would have to consider, therefore, whether plaintiff's inability to obtain a postdeprivation hearing before the Board of Tax Appeals for over two years—a hearing in which the Board then declined on jurisdictional grounds to decide all issues raised by the taxpayer—denied plaintiff the process that was due him under the Fourteenth Amendment.

The majority does not determine whether the extraordinary delay in granting plaintiff a postdeprivation hearing constituted a denial of due process—the constitutional issue raised by plaintiff's section 1983 action against the state defendants. Instead, it refers to the fact that Michigan has certain "corrective procedures" in the form of available state court actions that plaintiff could have pursued, namely, an appeal to the Michigan Supreme Court from the adverse decision of the Board of Tax Appeals, an action for recovery of the money in the Michigan Court of Claims, and an action in the Michigan Circuit Court of plaintiff's residence. According to the majority, "it was open to plaintiff to file in Wayne County Circuit Court for a post seizure hearing to test his federal constitu-

tional claims asserted under section 1983 as well as his state claims."

The majority opinion rests upon a rule of law announced by this Court in its recent decision in *Vicory v. Walton*, 721 F.2d 1062 (6th Cir.1983). Although *Vicory* is somewhat analogous to the situation in *Parratt*, in that the allegedly wrongful retention of property was apparently the result of the random and unauthorized conduct of a state official, this Court stated its rule in that case very broadly:

> We conclude under the authority of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), that in section 1983 damage suits for deprivation of property without procedural due process the plaintiff has the burden of pleading and proving the inadequacy of state processes, including state damage remedies to redress the claimed wrong.

*Vicory*, 721 F.2d at 1063.

Inasmuch as the plaintiff in the present case had available to him, at the time he brought his section 1983 action, state court remedies to redress the claimed wrong by the state defendants, including a state court action "to test his federal constitutional claims," the majority concludes that plaintiff failed to meet the *Vicory* requirement of pleading and proving the inadequacy of state court remedies.

In my view, the *Vicory* rule goes too far. *Parratt* contains nothing that mandates such a requirement in *all* section 1983 damage suits based on deprivation of property without procedural due process. As noted earlier, *Parratt* dealt with a limited type of activity—the random and unauthorized act of a state employee. In that type of case, the adequacy of state damage remedies to redress the claimed wrong might well be relevant. If, however, state officials deliberately deprive a person of property under an established state procedure that could have provided a proper predeprivation hearing but did not, or, if no predeprivation hearing was feasible or required, failed to provide a proper postdeprivation hearing, the due process violation is complete, and

the fact that other remedies might be available in the state courts to redress the claimed constitutional wrong does not defeat the plaintiff's section 1983 claim.

It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.

*Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 481, 5 L.Ed.2d 492 (1961).

*Parratt*, in other words, dealt with the question of whether a due process violation had ever become complete. The inability of the state to build into its procedures the predeprivation hearing required by due process—due to the random and unauthorized nature of the state action—made the existence of adequate state processes to redress the claimed wrong sufficient to satisfy due process. Thus, no violation of the constitutional due process requirement had ever occurred. The *Vicory* rule, as stated, and as applied by the majority in this case, however, would go beyond *Parratt* by including within its reach those cases in which the state has deliberately taken and retained property pursuant to an established state procedure in which the state clearly had the ability but failed to provide either the predeprivation or the postdeprivation hearing required by the Fourteenth Amendment. Thus, while the state's failure to provide such a hearing would complete the constitutional violation, *Vicory* would nevertheless deny the deprived plaintiff access to federal court so long as the state offers some process, including state damage remedies, to redress its own wrongdoing. Under these circumstances, the rule acts as nothing less than a requirement of exhaustion of state remedies, using the approach of defining the elements of a section 1983 claim, and is, therefore, in contravention of *Monroe* and *Patsy v. Board of Regents of State of Florida*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).[10]

In the present case the plaintiff was unable to obtain a postdeprivation hearing before the Board of Tax Appeals for over two years after his property had been summarily seized by the Department of Treasury. The Board itself noted in its earlier order that its inability to hear the appeal when plaintiff first appealed to the Board was "an obvious deprivation of fundamental due process." A court could find, as the Board apparently thought, that plaintiff indeed had been denied due process or, in other words, that the alleged constitutional violation was complete. The fact that plaintiff persisted in his efforts and, by a mandamus action, ultimately forced the state to give him a hearing before the Board would not extinguish the violation. Nor would the fact that plaintiff could then have appealed the Board's adverse decision to the Michigan Supreme Court or brought an independent action in the Michigan Court of Claims or in the Michigan Circuit Court of Appeals to assert his constitutional claim detract from the fact that he had been denied due process. The state may well have provided these and even other remedies for redress of its own wrongdoing—but Congress also provided a remedy in 42 U.S.C. § 1983, and it is clearly a remedy "supplementary to the state remedy." *Monroe*, 365 U.S. at 183, 81 S.Ct. at 481. When the due process violation has occurred in connection with an established state procedure, plaintiff should not be relegated to the Wayne County Circuit Court or any other state court "to test his federal constitutional claims asserted under section 1983." The federal courthouse was a proper forum for plaintiff to test those federal constitutional claims and, in my opinion, *Parratt* does not close those doors when the state has violated a person's right to procedural due process under its established procedure, even though the state has some form of "corrective process" to remedy its own wrongdoing. *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

10. *Patsy* reiterated the rule set forth in *Monroe* that section 1983 plaintiffs need not exhaust state remedies before bringing an action in federal court.

Recently, in *Wilkerson v. Johnson*, 699 F.2d 325 (6th Cir.1983), this Court affirmed a judgment for plaintiffs in a section 1983 action against defendant agents of a state licensing agency for depriving plaintiffs of liberty and property without due process of law by refusing plaintiffs a license. Defendants in that case contended that plaintiffs failed to show any deprivation "without due process of law," because the state of Tennessee provided a procedure to remedy any wrong done by the defendants. It was argued, therefore, that under *Parratt* there could be no finding of a section 1983 violation. In flatly rejecting this argument, this Court said,

> *Parratt* does not control this case for two reasons. First, the holding in *Parratt* must be construed in light of the Supreme Court's recent decision in *Patsy v. Board of Regents of State of Florida*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). In that case, the Court held that § 1983 plaintiffs need not exhaust state administrative remedies before bringing an action in federal court. Since the decision in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), it has been the rule that a § 1983 plaintiff need not attempt to vindicate his or her claim in state court before asserting it in federal court. To apply the holding of *Parratt* outside the prisoners' rights context is inconsistent with *Monroe* and *Patsy*.

699 F.2d at 329.

While I personally believe that *Parratt* does have application "outside the prisoners' rights context," I fully agree that *Monroe* and its progeny make it clear that a section 1983 plaintiff need not resort to remedies provided by the state in order to obtain the federal court remedy for a violation of plaintiff's constitutional rights, regardless of whether those rights are substantive or procedural in nature.

Even more recent and even more applicable to the present case is this Court's decision in *Loudermill v. Cleveland Bd. of Education*, 721 F.2d 550 (6th Cir.1983). In this consolidated case, two plaintiffs, classi-fied civil service employees, brought section 1983 actions in federal court, contending that defendants, in discharging them, had deprived them of their property right to continuing employment without any pre-deprivation hearing or prompt postdeprivation hearing, in violation of their rights to procedural due process under the Fourteenth Amendment. Plaintiff Loudermill had appealed his discharge to the Cleveland Civil Service Commission, which held hearings but affirmed his discharge. Plaintiff Donnelly had appealed to the Parma Civil Service Commission, which held a hearing, ordered him reinstated, but made no provision for the award of backpay. Although the state of Ohio provided for appeals to the Ohio common pleas courts from such adverse administrative determinations, neither plaintiff appealed but instead filed section 1983 actions in the federal court.

The claim asserted by both Loudermill and Donnelly—a deprivation of property without any predeprivation hearing and without any prompt postdeprivation hearing—is essentially the same claim asserted by plaintiff in the present case. The plaintiff in the present case, like Loudermill and Donnelly, did not appeal the adverse administrative determination to the state appellate court but chose, instead, to pursue his section 1983 action in federal court.

This Court in *Loudermill* had no trouble rejecting any contention that the plaintiffs were required to pursue judicial remedies provided them by the state of Ohio.

> By refusing to require exhaustion of even administrative remedies, the Court in *Patsy* left little room for a judicial exhaustion requirement.... Plaintiffs seeking to vindicate their constitutional rights, *whether substantive or procedural in nature, United Church of the Medical Center v. Medical Center Commission*, 689 F.2d 693, 697–98 (7th Cir. 1982), cannot be deprived of the opportunity to proceed in the federal courts.

*Loudermill*, 721 F.2d at 555 (emphasis added) (footnote omitted). This Court likewise had no trouble holding that the availability of state procedures for remedying a wrong-

ful deprivation of property by the state does not necessarily satisfy the procedural due process requirement of the Fourteenth Amendment.

> In other words, the fact that Ohio provided appellants in this case with full evidentiary hearings after termination does not suggest that no other process was due. We must determine independently whether the post-termination hearings provided under Ohio's statutory scheme satisfied federal due process requirements.

*Loudermill,* 721 F.2d at 560.

These same fundamental principles, in my view, are clearly as applicable to the present case as they were to the *Loudermill* cases. Plaintiff here, like the plaintiffs in *Loudermill,* was not required to pursue an appeal to the Michigan state court from the adverse decision of the administrative agency and certainly was not required to file a claim with the state's court of claims or bring an action in the state circuit court before seeking relief in federal court. Also, the mere availability of a hearing before the Board of Tax Appeals (especially considering when it was granted and the nature of the hearing) and the mere availability of separate legal actions in the court of claims or the circuit court does not answer the question of whether the state took plaintiff's property without providing him the procedural due process required by the Constitution. A federal court must, as this Court did in *Loudermill,* determine independently whether plaintiff's opportunities for a post-deprivation hearing satisfied federal due process requirements.

This Court in *Loudermill* carefully considered the question of whether the failure of the state to provide any predeprivation hearing was a violation of procedural due process. It distinguished *Parratt* as a case in which affording process before deprivation was "just not feasible or practical," 721 F.2d at 562. After analyzing, in accordance with *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the competing interests of the government and the individual that must be accommodated to determine what process is due, this Court concluded that the failure to give plaintiffs an opportunity to present evidence challenging the proposed discharges before they occurred violated the Fourteenth Amendment. 721 F.2d at 563. This Court, however, did not stop there. It also carefully considered the question of whether the delays in providing plaintiffs any postdeprivation hearing denied them due process. In Loudermill's case the Civil Service Commission did not conduct a hearing before the full commission until eight months after his discharge. In Donnelly's case the Civil Service Commission did not hold a hearing until nine and one-half months after his discharge. Recognizing that "due process requires that a hearing be held, not just 'in a meaningful manner,' but also at a 'meaningful time'," the Court held that a delay in holding a postdeprivation hearing "must be 'excessive' or 'unreasonable' before federal due process is denied." 721 F.2d at 563–64. Acknowledging that "determining a reasonable time period defies easy exegesis," the Court concluded that the delays in that case did not violate due process. 721 F.2d at 564.

Because the merits of plaintiff's constitutional claims were not decided by the District Court and have been neither briefed nor argued on this appeal, it would be inappropriate to resolve them at this point. The critical issue here is whether a plaintiff in such a position should be given an opportunity to press such claims in federal court in a section 1983 action. It is my firm belief that plaintiff did state in federal court a legitimate section 1983 claim, that he was not required to pursue either the administrative or judicial remedies provided by Michigan before resorting to the federal court, and that the mere availability of those remedies does not answer the question of whether they constituted all the process that was due plaintiff under the Fourteenth Amendment. The existence of an opportunity "to test his federal constitutional claims" in the state circuit court or, indeed, in any other state forum does not

prevent plaintiff from testing those constitutional claims in the federal court.

### B.

As noted earlier, plaintiff, in addition to his claim based upon a denial of his procedural due process rights under the Fourteenth Amendment, also asserted a claim based upon his right to equal protection of the laws under the Fourteenth Amendment. The latter claim arose from the fact that although the Department of Treasury had always granted taxpayers whose property had been seized under jeopardy assessments a departmental hearing, in plaintiff's case this practice was suddenly stopped, and he was denied a hearing even after one had been scheduled for him. Although this claim is not discussed in the majority opinion, neither *Parratt* nor *Vicory* contains anything that would prevent plaintiff from asserting this section 1983 equal protection claim in federal court, regardless of whatever state remedies may exist for the redress of such a wrong.

### C.

Although I disagree with the "different ground" upon which the majority chooses to affirm the District Court's summary judgment in favor of the state defendants, I believe the District Court correctly rendered that judgment on the immunity grounds upon which the motion was based. After carefully considering the affidavits and extensive discovery materials supporting the motion, noting that the state defendants relied upon the advice and recommendation of counsel and that the infirmities in Michigan's jeopardy assessment statutes regarding postdeprivation hearings were not known to defendants at that time, the Court held that the state defendants were entitled to immunity under *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). For the reasons stated in the District Court's thorough and carefully written opinion, I would affirm the summary judgment against the state defendants on immunity grounds.[11]

### IV.

The majority opinion makes no distinction between the District Court's ruling on the state defendants' motion for summary judgment and the District Court's ruling on the city defendants' motion for a directed verdict at the close of plaintiff's evidence. Presumably the majority affirms both rulings on the ground that plaintiff failed to meet the *Vicory* requirement of pleading and proving that available state remedies are inadequate or systemically defective. Finding plaintiff's remedies under Michigan law to be "clearly adequate," the majority also affirms the judgment in favor of the city defendants.

In my opinion, plaintiff's section 1983 action against the Detroit police officers is not a "procedural due process action brought under 42 U.S.C. § 1983," and, therefore, neither *Parratt* nor *Vicory* should have any application to plaintiff's section 1983 claim against the city defendants.

### A.

Plaintiff's claim against the city defendants is based upon the allegedly unreasonable search and seizure of his property by Detroit police officers—precisely the same claim made in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). As the Supreme Court in *Monroe* pointed out, "the guarantee against unreasonable searches and seizures contained in the Fourth Amendment has been made applica-

---

**11.** It is not necessary to consider the alternative basis suggested by the District Court, *i.e.*, that plaintiff was precluded from proceeding against the state defendants primarily by reason of the unappealed adverse decision of the Board of Tax Appeals. *But see Loudermill v. Cleveland Bd. of Education*, 721 F.2d 550 (6th Cir.1983).

It is doubtful that plaintiff's action in the Michigan circuit court of appeals, in light of that court's determination regarding its jurisdiction, would have any claims preclusion effect. *Cf. Migra v. Warren City School District Bd. of Education*, —— U.S. ——, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984).

ble to the States by reason of the Due Process Clause of the Fourteenth Amendment. *Wolf v. Colorado,* 338 U.S. 25 [69 S.Ct. 1359, 93 L.Ed. 1782]; *Elkins v. United States,* 364 U.S. 206, 213 [80 S.Ct. 1437, 1441, 4 L.Ed.2d 1669]." 365 U.S. at 171, 81 S.Ct. at 475. It seems clear that the Court was not referring to the *procedural* due process requirement of the Fourteenth Amendment but, instead, to the *substantive* due process requirement of that Amendment as described in *Wolf:*

> This clause exacts from the States for the lowliest and the most outcast all that is "implicit in the concept of ordered liberty." [*Palko v. Connecticut* ] 302 U.S. [319] at 325 [58 S.Ct. 149, 152, 82 L.Ed. 288].

> Due process of law thus conveys neither formal nor fixed nor narrow requirements. It is the compendious expression for all those rights which the courts must enforce because they are basic to our free society....

> The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society. It is therefore implicit in "the concept of ordered liberty" and as such enforceable against the States through the Due Process Clause.

338 U.S. at 27–28, 69 S.Ct. at 1361.

*Parratt* dealt solely with a claim of a denial of procedural due process, and the Supreme Court carefully distinguished this type of claim from the substantive due process claim involved in *Monroe:*

> The only deprivation respondent alleges in his complaint is that "his rights under the Fourteenth Amendment of the Constitution of the United States were violated. That he was deprived of his property and Due Process of Law." App. 8. As such, respondent's claims differ from the claims which were before us in *Monroe v. Pape, supra,* which involved violations of the Fourth Amendment, and the claims presented in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), which involved alleged violations of the Eighth Amendment. Both of these Amendments have been held applicable to the States by virtue of the adoption of the Fourteenth Amendment. See *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Respondent here refers to no other right, privilege, or immunity secured by the Constitution or federal laws other than the Due Process Clause of the Fourteenth Amendment *simpliciter.*

451 U.S. at 536, 101 S.Ct. at 1913.

Thus, as I understand *Monroe* and *Parratt,* if the state's conduct can be said to violate an individual's substantive, as opposed to procedural, due process rights the violation of the Fourteenth Amendment is complete at the time of such conduct, and the fact that the state may have provided procedures for a redress of that deprivation is of no consequence in a section 1983 action. In *Palmer v. Hudson,* 697 F.2d 1220 (4th Cir.1983), the Fourth Circuit recognized the distinction by stating,

> *Parratt v. Taylor* does not trench upon the right to a 1983 remedy for an unreasonable search, for the right violated is the substantive right to privacy and not a right to procedural due process. See *Parratt v. Taylor,* 451 U.S. at 534–6, 101 S.Ct. at 1912–13 [distinguishing *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) ].

697 F.2d at 1225.

In looking at plaintiff's evidence in the light most favorable to plaintiff, *Dowdell v. U.S. Industries, Inc.,* 495 F.2d 641, 643 (6th Cir.1974), I conclude that (a) plaintiff's evidence was sufficient to create a jury issue on the question of whether the city defendants violated plaintiff's rights under the Fourth and Fourteenth Amendments and (b) plaintiff's own evidence did not establish the immunity defenses upon which the city defendants relied.

### 1.

Although the search warrant does not appear as a part of the record on appeal, it is clear from the opening statement of defense counsel that the search warrant list-

ed the following property to be seized: "all books, records or documents, including photographs related to homicide and illegal drug transactions and all guns and bullets." (Joint Appendix 627.) This is virtually the identical language set forth in the decision of Judge Leonard of the Recorder's Court finding that the money seized was not within the scope of the search warrant. (Joint Appendix 65). In the argument on defendants' motion for directed verdict, defense counsel conceded that Judge Leonard's order "says that based upon the available constitutional law in dealing with searches that this search exceeded that which the constitution permits." (Joint Appendix 683.) As the city defendants stated in this appeal, "the warrant specified a number of items being sought, but did not include cash." (Appellees' brief, p. 9.)

The Fourth Amendment specifically requires that a search warrant must particularly describe "the things to be seized." As the Supreme Court said in *Marron v. United States*, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927),

> [t]he requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.

275 U.S. at 196, 48 S.Ct. at 76.

On this appeal, the city defendants do not attempt to argue that the money seized was within the scope of the warrant. Rather, they attempt to justify the seizure on two grounds: (1) the seizure was permissible under *United States v. Golay*, 502 F.2d 182 (8th Cir.1974), or (2) the police, having broken down the door of plaintiff's house, had a duty "to protect the property uncovered from theft or removal by unauthorized persons." (Appellees' brief, p. 11.) Neither argument, in my view, would support the granting of the city defendants' motion for a directed verdict.

First, *Golay* was a "plain view doctrine" case, and it is clear that the plain view doctrine is limited by a requirement that "the discovery of evidence in plain view must be inadvertent." *Coolidge v. New Hampshire*, 403 U.S. 443, 469, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564 (1971). In the present case, the testimony at trial of two of the defendant police officers that the officers were told in advance of the search of plaintiff's house to search also for money (Joint Appendix 635, Officer Awe; Joint Appendix 645, Officer Mazzone) was sufficient to create a jury issue on the question of whether the city defendants had violated plaintiff's Fourth and Fourteenth Amendment rights. As the Supreme Court in *Coolidge* pointed out,

> This Court has never permitted the legitimation of a planned warrantless seizure on plain view grounds, . . ., and to do so here would be flatly inconsistent with the existing body of Fourth Amendment law.

403 U.S. at 471 n. 27, 91 S.Ct. at 2041 n. 27.

Defendants' second argument, that, having broken down the door of plaintiff's house, the police were justified in taking the cash because they had some "duty" to protect the cash, merits little comment. Having made the house insecure, the police could have made it secure by the posting of police guards until the door was replaced. Furthermore, it does not appear that any effort was ever made to deliver the money to the plaintiff. It would be not only a novel but a dangerous rule of law that would excuse an illegal search and seizure on the ground that the breaking into a home renders the property therein subject to theft, and, therefore, any and all items of value can be removed by the police with impunity. It is precisely this type of conduct by law enforcement officers that the Fourth Amendment was meant to prohibit.

**2.**

The District Judge did not discuss the sufficiency of the evidence to establish a violation of plaintiff's constitutional rights but, instead, granted defendants' motion for a directed verdict on immunity grounds. In doing so, I believe he inadvertently ap-

plied an incorrect standard and thereby committed error. In his ruling he stated,

[t]he Plaintiff need only prove the essential elements of 1983 which are very simple, but in the establishment of these essential elements, when the Defendant has raised the question of good faith, ... the Plaintiff—and when the facts are due to show that this has been applied or is reasonable, then the Plaintiff does have the burden to show that these officers acted in bad faith or lack of good faith and that is squarely what the Court of Appeals in this circuit held in *Geha v. O'Brien* [sic].

(Joint Appendix 690.)

It is true that in *Jihaad v. O'Brien*, 645 F.2d 556 (6th Cir.1981), this Court said,

[t]he defendants pled official immunity as an affirmative defense. It was not contested that O'Brien was acting within the scope of his discretionary authority in conducting the hearing. This was sufficient to establish a prima facie case of entitlement. The burden of proving that O'Brien was not entitled to official immunity was then on the plaintiff. The plaintiff failed to show that the defendant was not entitled to immunity under one of the tests set forth in *Wood. See Douthit v. Jones*, 619 F.2d 527, 534 (5th Cir.1980). The defendant O'Brien was entitled to judgment under the doctrine of qualified official immunity.

645 F.2d at 564.

As I interpret *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and this Court's later decision in *Alexander v. Alexander*, 706 F.2d 751 (6th Cir.1983), the above statement from *Jihaad* does not represent the current standard to be applied. As I read those cases, a section 1983 plaintiff has no burden at any time to prove that a defendant is not entitled to immunity. The burden is always on the defendant to both plead and prove entitlement to the claimed immunity. In the *Alexander* case, the District Judge, like the District Judge in the present case, required plaintiff to prove that the defendant was not entitled to the protection of the quali-fied immunity defense. In reversing the lower court, this Court said, relying upon *Harlow* and many other decisions,

[w]hile the plaintiff in a Section 1983 action bears the burden of pleading and proving that the defendant deprived him of a federal right while acting under color of state or territorial law, an assertion of qualified immunity is an affirmative defense which must be pleaded and proved by the defendant official.

.      .      .      .      .

Therefore, in light of *Harlow's* modification of the qualified immunity standard and the Supreme Court's recent instruction to this circuit to apply *Harlow* retroactively, *Wolfel v. Sanborn*, 691 F.2d 270, 271 (6th Cir.1982), we hold that a Section 1983 defendant retains the burden of pleading the qualified immunity defense, *Harlow v. Fitzgerald*, 457 U.S. at 815, 102 S.Ct. at 2737, and proving either that the law was not clearly established at the time of plaintiff's alleged injury, or, if the law was clearly established, that he neither knew nor should have known of the relevant legal standard due to extraordinary circumstances. *Id.* at 819, 102 S.Ct. at 2739. Since the district court placed the burden of proving the qualified immunity defense on the wrong party, we remand this case to the district court for reconsideration of this issue in light of this opinion.

706 F.2d at 754.

In the present case, there is no question that when plaintiff's property was seized the law dealing with search warrants and the Fourth Amendment prohibition against seizing articles not listed in the warrant was clearly established. Although it would still be open to the city defendants to try to prove they neither knew nor should have known of the relevant legal standard due to extraordinary circumstances, the defendants never had to meet that formidable challenge because the District Judge directed a verdict in their favor at the close of plaintiff's evidence.

As the Supreme Court said in *Harlow*, "[i]f the law was clearly established, the

immunity defense ordinarily should fail, since a reasonably competent public official should known the law governing his conduct." 457 U.S. at 818–19, 102 S.Ct. at 2738–39. There is nothing in plaintiff's own evidence that would show that any of the police officers in this case did not know and should not have known of the law applicable to search warrants, namely, that the search for and seizure of property not specifically listed in the warrant violates the Fourth Amendment. Therefore, in my opinion, the District Court committed error in directing at the close of plaintiff's own evidence a verdict in favor of the city defendants on the ground of their qualified immunity.

## V.

If, as some believe, section 1983 "has evolved into a judicial Frankenstein monster," [12] then Congress, of course, can act to narrow the scope of the remedy as it now has been defined by decisions of the Supreme Court during the past two decades.[13] I am concerned, however, that, as commendable as they may be, judicial attempts to relegate more and more plaintiffs to the state courts for remedies in procedural due process cases may result in throwing the baby and not just the bath water out of the federal court house.

For the reasons stated, I conclude that the affirmance of the summary judgment in favor of the state defendants is correct, but not for the reason given in the majority opinion, and I respectfully dissent from that portion of the majority opinion affirming the judgment entered on the granting of the city defendants' motion for a directed verdict at the close of plaintiff's evidence.

---

**12.** *The Supreme Court Continues Its Journey Down the Ever Narrowing Paths of Section 1983 and the Due Process Clause: An Analysis of Parratt v. Taylor,* 10 Pepperdine L.Rev. 579 (1982–83).

**13.** *Vicory v. Walton,* 721 F.2d 1062 (6th Cir. 1983) (concurring opinion of Bertelsman, District Judge).