Daniel PHILIPP, a mentally retarded citizen, by his sister and next friend Shirley Stone; Virginia Hains, a mentally retarded citizen, by her mother and next friend, Ann Hains; Francis Wilbur; Kathy Swartz, an infant, by her mother and next friend Bridget Swartz, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

Hugh L. CAREY, Governor of the State of New York; James E. Introne, Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities; Michael Dillon, Director of the Syracuse Developmental Center, Syracuse, New York, Defendants.

No. 80–CV–508.

United States District Court,
N. D. New York.

June 30, 1981.

As Amended Oct. 3, 1981.

Onondaga Neighborhood Legal Services, Inc., Syracuse, N.Y., Monroe County Legal Assistance Corporation, Greater Upstate Law Project, Rochester, N.Y., for plaintiffs; Christina M. Pezzulo, Syracuse, N.Y., Betsy B. Swain, Elizabeth L. Schneider, Rochester, N.Y., of counsel.

Robert Abrams Atty. Gen. of the state of N. Y., Albany, N.Y., for defendants; James G. McSparron, David B. Roberts, Alan M. Adler, Albany, N.Y., of counsel.

## MEMORANDUM—DECISION AND ORDER

MUNSON, Chief Judge.

The Syracuse Developmental Center [SDC] is a 560 bed, state-owned mental health care facility in Syracuse, New York. Persons are confined at SDC by one of three means. First, some individuals are involuntarily confined pursuant to court order. N.Y. Mental Hygiene Law § 15.27. Second, in many instances an individual, or his parent, guardian, or committee, may request admittance. N.Y. Mental Hygiene Law § 15.13. Finally, persons who lack the necessary mental capacity to make their own decisions are admitted on a "non-objecting" status. N.Y. Mental Hygiene Law § 15.25.

The plaintiffs are mentally retarded residents of SDC. None of them have been placed in SDC pursuant to court order. They have instituted this action under 28 U.S.C. §§ 1331, 1343, 2201, and 2202 for declaratory and injunctive relief against the defendants, who allegedly bear responsibility for the operation of SDC and for the provision of services to the plaintiffs.

The gravamen of the complaint is that the plaintiffs are provided inappropriate programs and services, and that the plaintiffs are capable of residing in less restrictive settings in the community. Specifically, the plaintiffs argue that at SDC, the defendants, as a substitute for proper care, administer debilitating psychotropic drugs and other medications to mitigate undesirable behaviors that allegedly are induced by institutionalization. In addition, they aver that the SDC staff is inadequate to protect them from physical harm or to provide them in all other respects with suitable care and with specialized services such as speech or hearing therapy. Moreover, although many residents have been specifically recommended by SDC personnel for community placements, the defendants have not established extrainstitutional residential opportunities. Thus, the plaintiffs are allegedly confined unnecessarily and improperly in an institutional environment where they are stagnating and not recognizing their full intellectual, emotional, social, and physical potential, and where they are, in many instances, regressing and deteriorating.

Because of these alleged actions and omissions, the plaintiffs claim that their rights under the federal and state Constitutions and under various federal and state statutory and regulatory schemes have been violated. Specifically, the plaintiffs allege violations of the First, Fourth, Eighth, Ninth, and Fourteenth Amendments to the federal Constitution; violations of 29 U.S.C. § 794 and of 42 U.S.C. §§ 1983, 6010; violations of 45 C.F.R. §§ 84.34(a), (b), and 84.54; violations of Article XVII and Sections 1, 3, 4, and 6 of the New York State Constitution; and violations of New York Mental Hygiene Law §§ 13.07, 13.15, 29.15, 29.16, 31.01, 31.04, 31.19, 33.01, 33.03, and 41.33.

Presently before the Court are motions by the defendants for dismissal of the complaint under Fed.R.Civ.P. 12(b)(6), or, in the alternative, under the doctrine of abstention, and by the plaintiffs for class action certification.

### I.

Turning to the defendants' motion to dismiss, the standard of review under Fed.R. Civ.P. 12(b)(6) is a narrow one. A complaint should be dismissed only if the plaintiff is not entitled to relief under any set of

facts he could prove. In making this determination, a court must construe the complaint liberally, and deem admitted all material averments. *See Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Because the defendants have put forth numerous arguments in support of this motion, their contentions shall be addressed separately.

### A.

For their first principle argument, the defendants contend that the plaintiffs have no cognizable federal constitutional rights.

#### 1. *Eighth Amendment and Due Process Clause*

The plaintiffs claim a right to treatment, or habilitation, in a setting that is least restrictive of their liberty, and freedom from harm under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. They define "habilitation" as:

> the process of attaining and maintaining such self-care and self-support skills as will enable retarded citizens to achieve the maximum degree of independence their capacities permit, and provide them with a realistic opportunity to lead a more useful and meaningful life and to return to society.

It is the defendants' position that only non-dangerous persons who are involuntarily committed for the purpose of treatment enjoy a right to treatment; that the named plaintiffs, as evidenced by their complaint, do not enjoy such protection because none of them have been civilly committed; and that the plaintiffs can assert no Eighth Amendment rights in this non-criminal context.

With respect to the defendants' arguments, it is true that courts have tended to recognize a general right to treatment, or habilitation, in favor of nondangerous, civilly committed persons. These courts, for the most part, have rooted such a right in liberty interests secured by the Due Process Clause. *See, e. g., Romeo v. Youngberg*, 644 F.2d 147, 157–58 (3d Cir. 1980) (en banc), *cert. granted,* —— U.S. ——, 101 S.Ct. 2313, 68 L.Ed.2d —— (1981); *Scott v. Plante*, 641 F.2d 117, 130–33 (3d Cir.) *pet. for cert. filed* April 10, 1981, 80–1699, 49 U.S.L.W. § 790 (April 21, 1981); *Goodman v. Parwatikar*, 570 F.2d 801, 804 (8th Cir. 1978); *Wyatt v. Aderholt*, 503 F.2d 1305, 1312 (5th Cir. 1974); *Donaldson v. O'Connor*, 493 F.2d 507, 518–27 (5th Cir. 1974), *vacated and remanded on other grounds*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Covington v. Harris*, 419 F.2d 617, 622–23 (D.C.Cir. 1969). *But see New York State Association for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. 752, 758–64 (E.D.N.Y.1973). *Cf. Vitek v. Jones*, 445 U.S. 480, 491–92, 100 S.Ct. 1254, 1262–1263, 63 L.Ed.2d 552 (1980); *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979); *O'Connor v. Donaldson*, 422 U.S. 563, 573, 95 S.Ct. 2486, 2492, 45 L.Ed.2d 396 (1975). For example, some courts have engaged in a *quid pro quo* analysis: where the justification for civil commitment in the first instance is treatment, fundamental notions of Due Process would be offended if treatment were not forthcoming. *See, e. g., Scott v. Plante*, 641 F.2d at 130 n. 12; *Wyatt v. Aderholt*, 503 F.2d at 1312. Alternatively, one might argue that treatment must be provided in order that the State's exercise of its *parens patriae* power would not serve as a guise for arbitrary action. *Cf. Morales v. Turman*, 562 F.2d 993, 997 (5th Cir.), *rev'd and remanded on other grounds*, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977).

Whatever the rationale for the right, its content has been described as a

> right to a program of treatment that affords the individual a reasonable chance to acquire and maintain those life skills that enable him to cope as effectively as his own capacities permit with the demands of his own person and of his environment and to raise the level of his physical, mental, and social efficiency.

*Gary W. v. Louisiana*, 437 F.Supp. 1209, 1217 (E.D.La.1976). Another court has noted that the right implies both that treatment be afforded to willing persons who

require it, and that limits be placed upon the State's power to impose a mode of treatment upon persons who do not want it. *See Romeo v. Youngberg*, 644 F.2d at 165.

Consistent with such views, courts have specified various conditions that are essential to secure the right to treatment or habilitation. These conditions include a humane, safe living environment free from bodily harm by others and presumably from deliberate indifference to medical needs, *see, e. g., Romeo v. Youngberg*, 644 F.2d at 157–58; *Scott v. Plante*, 641 F.2d at 131; *Goodman v. Parwatikar*, 570 F.2d at 804; *Davis v. Hubbard*, 506 F.Supp. 915, 922 (N.D.Ohio 1980); *Woe v. Mathews*, 408 F.Supp. 419, 428 (E.D.N.Y.1976), *aff'd without opinion sub nom. Woe v. Weinberger*, 562 F.2d 40 (2d Cir. 1977), *cert. denied sub nom. Woe v. Califano*, 434 U.S. 1048, 98 S.Ct. 895, 54 L.Ed.2d 799 (1978); *Welsch v. Likins*, 373 F.Supp. 487, 493 (D.Minn.1974), *vacated in part and remanded in part*, 550 F.2d 1122 (8th Cir. 1977); *Wyatt v. Stickney*, 334 F.Supp. 1341, 1343 (M.D.Ala.1972), *aff'd sub nom. Wyatt v. Aderholt, supra; see also Spence v. Staras*, 507 F.2d 554, 557 (7th Cir. 1974); *New York State Association for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. at 764–65; individualized treatment plans; *see, e. g., Wyatt v. Aderholt*, 503 F.2d at 1312; *Eckerhart v. Hensley*, 475 F.Supp. 908, 921 (W.D.Mo.1979); *Gary W. v. Louisiana*, 437 F.Supp. at 1219; *Welsch v. Likins*, 373 F.Supp. at 493; *Wyatt v. Stickney*, 373 F.Supp. at 1343; an adequate number of qualified staff, *see, e. g., Davis v. Hubbard*, 506 F.Supp. at 922; *Welsch v. Likins*, 373 F.Supp. at 493; *Wyatt v. Stickney*, 334 F.Supp. at 1343; and the proper administration of drugs, *see, e. g., Rogers v. Okin*, 634 F.2d 650, 652–60 (1st Cir. 1980); *cert. granted*, —— U.S. ——, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981); *Cf. Davis v. Hubbard*, 506 F.Supp. at 929.

In this regard, although, as noted above, some courts have identified the provision of a safe environment as a component of the right to treatment under the Due Process Clause, other courts have sought to ground such a right under the Eighth Amendment. *See, e. g., United States v. Solomon*, 563 F.2d 1121, 1124 (4th Cir. 1977); *Scott v. Plante*, 532 F.2d 939, 947 (3d Cir. 1976). Perhaps because the Supreme Court in *Ingraham v. Wright*, 430 U.S. 651, 669 n. 37, 97 S.Ct. 1401, 1411 n. 37, 51 L.Ed.2d 711 (1977), left open the question of the applicability of the Eighth Amendment to circumstances of confinement in mental institutions, these courts have analogized the restraints upon liberty that institutionalization imposes to the deprivations of incarceration. *See Donaldson v. O'Connor*, 493 F.2d at 520. *See also, Covington v. Harris*, 419 F.2d at 622; *Ragsdale v. Overholser*, 281 F.2d 943, 950 (D.C.Cir. 1960) (Fahy, J., concurring).

■ This Court, however, is of the opinion that the Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) has laid to rest the question left open in *Ingraham*. In *Bell*, the Court held that the Eighth Amendment does not govern the confinement of pre-trial detainees because of the absence of a formal adjudication of guilt. *Id.* at 535 n. 16, 99 S.Ct. at 1872 n. 16. Insofar as the Court chose not to extend the protections of the Eighth Amendment to fully incarcerated, pre-trial detainees, no principled basis would appear to justify an extension of the Eighth Amendment to the situation of civilly committed, institutionalized mentally retarded persons. *Accord: Romeo v. Youngberg*, 644 F.2d at 156 & n. 8.

In addition to the recognition of a general right to treatment for involuntarily committed persons, courts have tended also to recognize a more specific right to treatment in appropriate therapeutic settings least restrictive of personal liberty. *Cf. Pennhurst State School and Hospital v. Halderman*, —— U.S. ——, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981). Although the Third Circuit has suggested that a "least restrictive alternative" analysis is a component of the "compelling necessity" scrutiny frequently accorded governmental action, *see Romeo v. Youngberg*, 644 F.2d at 161 n. 27; *Scott v. Plante*, 641 F.2d at 130; *see also Rogers v. Okin*, 634 F.2d at 654, other

courts seem to have adopted a substantive analysis under the Due Process Clause separate from a quasi-procedural standard of review inquiry, apparently relying upon the Supreme Court's admonition in *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960):

> [E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties unless the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.

*See, e. g., Covington v. Harris*, 419 F.2d at 623 & n. 17; *Rone v. Fireman*, 473 F.Supp. 92, 125 (N.D.Ohio 1979); *Halderman v. Pennhurst State School and Hospital*, 446 F.Supp. 1295, 1319 (E.D.Pa.1977), *aff'd on other grounds*, 612 F.2d 84 (3d Cir. 1979) (en banc), *rev'd on other grounds*, —— U.S. ——, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Gary W. v. Louisiana*, 437 F.Supp. at 1216–17; *Woe v. Mathews*, 408 F.Supp. at 428; *Welsch v. Likins*, 373 F.Supp. at 501–02.

Not only do courts differ with respect to the characterization of the least restrictive alternative requirement, they also do not share a uniform view of what such a requirement entails. One court has written in terms of subjective "good faith attempts" to place persons in appropriate settings. *Welsch v. Likins*, 373 F.Supp. at 502. Another court has described a duty to "explore and provide . . . practicable alternatives to confinement." *Halderman v. Pennhurst State School and Hospital*, 446 F.Supp. at 1320. Still another court has asked whether a mode of treatment is "overly restrictive of liberty on a comparative basis." *Rone v. Fireman*, 473 F.Supp. at 125. Finally, a more recent statement of the requirement, which takes into account a deference toward medical judgments in individual cases, probes into "which of two or more major treatment approaches is to be adopted" in regard to "initial environmental disposition, not to ongoing therapeutic regimens or medical prescriptions." *Romeo v. Youngberg*, 644 F.2d at 166–67 & n. 46.

Under whatever version a court might adopt, it seems generally accepted that involuntarily committed persons enjoy a right to treatment in settings that pass muster under an appropriate least restrictive alternative inquiry. In safeguarding constitutional rights, courts, to greater or lesser extents, have ignored arguments to the effect that controlling weight should be accorded medical expertise in the context of institution-wide practices. *Cf. Parham v. J.R.*, 442 U.S. 584, 607–08, 99 S.Ct. 2493, 2506–07, 61 L.Ed.2d 101 (1979).

The only genuine controversy that divides the parties, then, concerns whether so-called voluntarily admitted persons, *i. e.*, persons who are not institutionalized pursuant to judicial process, enjoy a right to treatment in proper settings, as guaranteed to civilly committed persons.

On this question, courts are split. In rejecting any recognition of a right to treatment in favor of such individuals, the First Circuit has noted that unlike involuntarily committed persons, voluntarily admitted persons are free to leave, and thus a *quid pro quo* rationale is not germane. *See Harper v. Cserr*, 544 F.2d 1121, 1122–23 (1st Cir. 1976). *See also Rogers v. Okin*, 634 F.2d at 661. The First Circuit, however, has seemingly rejected a categorical rule in this regard:

> A voluntary patient . . . is legally not forced to endure the conditions although, depending on his degree of disability, the availability of other resources and of parents, spouses, friends and guardians, and so on, he may or may not be compelled *de facto* to endure the condition.

*Harper v. Cserr*, 544 F.2d at 1123. In contrast to the First Circuit, a district court in the Third Circuit has flatly rejected "voluntariness" as an "illusory concept," *Halderman v. Pennhurst State School and Hospital*, 446 F.Supp. at 1318, insofar as mentally disabled persons frequently have no practical alternative to total institutionalization and insofar as "voluntarily" admitted persons are deprived of liberty to the same extent as civilly committed persons, *id.*, at

1318–19. This same court has also adopted a tort analysis regarding this question:

> No constitutional mandate has been called to our attention which would require a state to provide habilitation for its retarded citizens. However, whenever a state accepts retarded individuals into its facilities, it cannot create or maintain those facilities in a manner which deprives individuals of the basic necessities of life. In the case of the retarded, this constitutes an obligation to provide them with minimally adequate habilitation.

*Id.* at 1318.

■ A resolution of this conflict is suggested by the decision of the Supreme Court in *Parham v. J.R., supra.* The issue in this case was whether the procedures governing a parent's "voluntary" commitment of a child comported with the requirements of Due Process. In discussing the nature of procedural due process in the context of voluntary adolescent admissions, the Court emphasized that "a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment," that "a child has a protectible interest in being free of unnecessary bodily restraints." 442 U.S. at 600, 601, 99 S.Ct. at 2503, 2504. Inasmuch as the Court's prescription of procedural safeguards for voluntarily admitted persons presupposes that such persons enjoy constitutionally protected liberty interests, it seems clear that courts must be quick to guard against unnecessary impairments of such interests. *See Vitek v. Jones,* 445 U.S. at 491, 100 S.Ct. at 1262. The recognition of a right to treatment for voluntarily admitted individuals is one way to insure that continued physical custody by the State does not wrongfully, or permanently, interfere with fundamental liberty interests like personal autonomy and bodily integrity. *See also Romeo v. Youngsberg,* 644 F.2d at 147–58.

■ In view of this state of the law, and without passing on the defendants' actions, the Court cannot conclude that the complaint fails to set forth a claim under the Due Process Clause.

### 2. Equal Protection Clause

The plaintiffs go on to argue that the defendants have created two classifications that are unlawful under the Equal Protection Clause of the Fourteenth Amendment. One classification concerns the treatment accorded non-handicapped, extrainstitutional persons who participate in various public services, as opposed to the treatment received by the mentally retarded residents of the SDC. The other classification purportedly differentiates between the residents of SDC, who allegedly receive inadequate community residential placements and services, and the mentally retarded residents of the New York City area, who allegedly receive adequate placements and services.

■ Equal Protection claims calling for strict judicial scrutiny generally arise under two contexts. *See Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). *First,* a state may be accused of discriminating against a "suspect" class of persons, along, for example, racial or alienage lines. *See, e. g., Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage); *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (race). One court has suggested that voluntarily and involuntarily admitted mentally retarded persons may also comprise a suspect class. *See Halderman v. Pennhurst State School and Hospital,* 446 F.Supp. at 1321–22. This position is not universally shared. *See, e. g., New York State Association for Retarded Children, Inc.,* 357 F.Supp. at 762. *Second,* Equal Protection violations have been found where a classification deprives a group of persons of a fundamental right. *See, e. g., Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969). The Due Process interest in liberty, which embraces a right to treatment in an appropriate setting, would appear to be one such fundamental right. *Cf. Benham v. Edwards,* 501 F.Supp. 1050, 1054 n. 1 (N.D.Ga.1980). Aside from these two situations, all other contested classifications fall under a "ra-

tional-basis" standard of review. *See, e. g., Massachusetts Board of Retirement v. Murgia,* 427 U.S. at 314, 96 S.Ct. at 2567; *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

■ To the extent, then, that the plaintiffs assert classifications that, among other arguments, are alleged to impinge fundamental liberty interests, they have stated claims under the Equal Protection Clause.

### B.

In addition to constitutional claims, the plaintiffs also seek to assert private rights of action under Section 6010 of the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. §§ 6000 *et seq.,* and under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The defendants contest the assertions of such causes, and continue by arguing that even if the plaintiffs can sue directly under these Acts, they are barred because of their failure to allege that they have exhausted available administrative remedies.

Since the commencement of this action, the Supreme Court has resolved part of these issues, holding in *Pennhurst State School and Hospital v. Halderman,* —— U.S. ——, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), that no private cause of action exists under Section 6010. Because this Section confers no substantive rights, *Id.* at 1545 & n. 21, no alternative remedy seemingly lies under 42 U.S.C. § 1983. *See Id.* at 1557 (White, J., dissenting in part) (considering § 1983 claim only after concluding that enforceable rights exist under Section 6010). *But see Naughton v. Bevilacqua,* 605 F.2d 586, 588 (1st Cir. 1979); *Naughton v. Bevilacqua,* 458 F.Supp. 610, 615–16 (D.R.I.1978).

■ In regard to the presence of a private action under Section 504, this Court is bound by the rule of law in this Circuit that a cause of action indeed exists under this Section in favor of private litigants. *See, e. g., Leary v. Crapsey,* 566 F.2d 863, 865 (2d Cir. 1977); *Kampmeier v. Nyquist,* 553 F.2d 296, 299 (2d Cir. 1977). Insofar as Section 504 confers substantive rights but provides no exclusive remedies, an action lies under 42 U.S.C. § 1983. *See Pennhurst State School and Hospital v. Halderman,* 101 S.Ct. at 1545; *Maine v. Thiboutot,* 448 U.S. 1, 4–8, 100 S.Ct. 2502, 2503–06, 65 L.Ed.2d 555 (1980).

■ With respect to the exhaustion argument of the defendants in regard to Section 504, this Court shares the view of other courts in this Circuit that the unavailability of meaningful administrative channels exempts a litigant's claim under this Section from an exhaustion requirement. *See Chaplin v. Consolidated Edison Company,* 482 F.Supp. 1165, 1174 n. 12 (S.D.N.Y.1980); *Sherry v. New York State Education Department,* 479 F.Supp. 1328, 1334 (W.D.N.Y. 1979); *Whitaker v. Board of Higher Education,* 461 F.Supp. 99, 107–09 (E.D.N.Y.1978). Moreover, Section 1983 also imposes no exhaustion requirement in this action because the prescribed administrative remedies seem available primarily to the Secretary, and not to private, individual claimants directly. *See* 45 C.F.R. §§ 80.6–10, Part 81 *See also Swan v. Stoneman,* 635 F.2d 97, 102–06 (2d Cir. 1980).

For these reasons, the plaintiffs may assert claims arising only under Section 504 or Section 1983.

### II.

As an alternative to dismissal under Fed. R.Civ.P. 12(b)(6), the defendants urge dismissal under the doctrine of abstention. Relying on *Railroad Commission v. Pullman Company,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the defendants maintain that this Court should decline to exercise jurisdiction because reference to the State program for mentally retarded persons contained in New York Mental Hygiene Law and 14 N.Y.C.R.R. Ch. II might avoid the federal claims. In addition to *Pullman* abstention, the defendants suggest that under the *Burford* abstention doctrine, *see Burford v. Sun Oil Company,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), the withholding of jurisdiction is proper because federal judicial supervision over the defendants would impermissibly inject this Court into the day-to-day administration of SDC.

Although this Court understands the concerns of the defendants, the Court does not share their position that abstention, a narrowly construed doctrine, is proper in this action. In the first place, *Pullman* abstention "is proper where deference to the state courts might allow the state to construe difficult issues of state law in a manner which avoids federal constitutional problems," *Levy v. Lewis*, 635 F.2d 960, 963 n. 2 (2d Cir. 1980), and where a state statute is ambiguous, *see Moe v. Dinkins*, 635 F.2d 1045, 1047–48 (2d Cir. 1980). Here, the presence of federal statutory claims and the clarity of the state statutes and regulations renders *Pullman* inapplicable. *Burford* also is inappropriate because the area of mental health, and the substantial federal involvement here, indicate that this Court would not be interfering with a specialized state regulatory scheme that involves matters of substantial state concern. *See Levy v. Lewis*, 635 F.2d at 963.

The Court, then, shall decline to invoke the doctrine of abstention.

### III.

Turning to the plaintiffs' motion for class action certification, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(2), the plaintiffs seek to bring this suit

> on behalf of themselves and all other present and prospective residents of SDC whose confinement there is more restrictive of their personal liberty than is necessary to provide them with appropriate treatment and habilitation.

In opposition to this motion, the defendants argue that the class is ill-defined and not susceptible to accurate delineation.

On this score, the Court tends to agree at the present time with the position of the defendants. After an examination of the evidentiary papers submitted by the plaintiffs, the Court finds it difficult to articulate what, if any, criteria and procedures underlie a determination that a mentally retarded resident of SDC is or is not eligible for placement in an alternative setting. In order to protect the rights and positions of both the plaintiffs and the defendants, this Court is of the opinion that a decision on this motion should be deferred until such time, following further discovery, that all parties to this action, as well as the Court, can better ascertain class membership.

### IV.

Accordingly, the defendants' motion to dismiss is granted in part and denied in part, and the plaintiffs' motion for class action certification is denied without prejudice. In this regard, it appears that the plaintiffs have abandoned their constitutional arguments under the First and Ninth Amendments. Further, in making these dispositions of the pending motions, the Court in no way expresses an opinion on the ultimate merits of the plaintiffs' claims, which raise difficult, unsettled questions in an evolving area of the law, or on the merits of any "good faith" defenses that might be asserted. Finally, the Court wishes to compliment the attorneys in this action on the well researched and well written papers that have been submitted in support of these motions.

IT IS SO ORDERED.