Darlene McCARTNEY, etc., Plaintiffs,

v.

Jankiel BARG, M.D. et al., Defendants.

No. C 83–26.

United States District Court,
N.D. Ohio, W.D.

April 3, 1986.

Jane S. Randall, A.B.L.E., Toledo, Ohio, for plaintiffs.

David J. Kovach, Asst. Atty. Gen., Cleveland, Ohio, Ronald S. Moening, Robison, Curphey & O'Connell, Toledo, Ohio, for defendants.

## MEMORANDUM AND ORDER

WALINSKI, Senior District Judge.

This matter is before the Court on defendants' motion to dismiss as well as plaintiff's opposition thereto and several related responsive and supplemental pleadings. The action is brought pursuant to 42 U.S.C. § 1983. Jurisdiction over the constitutional and federal statutory claims is based on 28 U.S.C. § 1343(3) and (4). In addition plaintiff requests the Court to exercise pendent jurisdiction over the state claims raised.

### I. Facts

The complaint alleges that plaintiff is a twenty-three year old woman who, because of her mental retardation, has been in state institutions since age ten. Defendants Barg, Widman, Raab, Kolkott, Masyk, and Wallerstein are all alleged to have been the Medical Directors of the Toledo Mental Health Center (TMHC) at various times during the events relevant herein. Defendant Mitch is named as the psychiatrist for the Dual Diagnostic Unit at TMHC. Defendant Rogers is identified as the Superintendent of TMHC, whose responsibilities include the overall supervision of the staff, the making of internal policy, and the implementing of department-wide policy.

The facts alleged in the complaint state that plaintiff was admitted to Columbus State Institution (CSI), a facility for the mentally retarded, in 1968. In addition to her retardation, plaintiff suffered from psychiatric and/or psychological impairments. Plaintiff was transferred from CSI to TMHC in 1978 pursuant to Executive Order G–31 and the Court Order under *O.A.R.C. v. Moritz*, No. C2–76–398 (S.D. Ohio 1977). The Executive Order was executed by the director of the Ohio Department of Mental Health and Mental Retardation in June, 1977, and was entitled "Provision of Mental Health Services to Mentally Retarded and Developmentally Disabled Clients." The complaint alleges that under this Executive Order defendants were required to place plaintiff so that she would receive both mental health and mental retardation services.

The purpose of the transfer from CSI to TMHC was allegedly to place plaintiff in the dual diagnostic ward so that she could receive both kinds of services she needed. Defendants Mitch and Barg, however, allegedly refused to place plaintiff in this unit. Instead, plaintiff was placed on a general psychiatric ward. As a result,

plaintiff was denied the habilitation appropriate for the treatment of her mental retardation and specific behavior disorder for approximately four years.

The complaint further alleges that at some point prior to May, 1982, defendant Rogers instituted a policy of criminally charging patients for behavior resulting from their mental condition, regardless of whether the patient had the capacity to form the requisite criminal intent. Plaintiff, while restrained in an isolation room on May 18, 1982, allegedly lit a match and ignited her bedsheets. Defendant Rogers consequently caused a criminal complaint against plaintiff to be filed, despite his alleged actual or constructive knowledge that she did not have the capacity to form the criminal intent necessary to support the charge.

Plaintiff spent the next five months in Lucas County Jail where she received no treatment for her mental condition, and allegedly suffered severe emotional psychological damage as a result. TMHC, through defendants Barg and Rogers, refused to accept plaintiff for residency during this period. She was found incompetent to stand trial on October 19, 1982.

Plaintiff raises several claims for relief as a result of these events. Plaintiff's fifth and seventh claims allege violations of her constitutional rights, including violations of procedural and substantive due process rights under the fourteenth amendment, and a violation of the eighth amendment proscription against cruel and unusual punishment. All other claims as discussed in greater detail later in this opinion, allege violations of state law, including false arrest, false imprisonment, malicious prosecution, intentional infliction of emotional distress, negligent infliction of emotional distress, and violations of O.R.C. § 5122.27 and the aforementioned Executive Order G–31. Plaintiff requests the award of substantial compensatory and punitive damages as well as costs and reasonable attorney's fees.

For the reasons which follow, defendants' motion to dismiss shall be granted in part and denied in part. Plaintiff's eighth amendment claim as well as all of her state claims shall be dismissed. Plaintiff's other due process claims survive defendants' motion.

## II. Federal Claims

■ The logical starting point for a consideration of the issues and parties involved in this case is an analysis of plaintiff's federal claims. Only if one or more of these claims survives defendants' motion to dismiss will it be necessary to consider plaintiff's state claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

Plaintiff states three constitutional claims, all of which are derived from the due process clause of the fourteenth amendment. This clause is actually the source of three distinguishable types of constitutional protection. First, the due process clause is a guarantee of fair procedure when a state seeks to legitimately deprive a person of protected liberty or property interests. *See, e.g., Williams v. Wallis*, 734 F.2d 1434, 1437–39 (11th Cir. 1984). Second, plaintiff claims a violation of substantive due process, which bars certain arbitrary government action "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, —— U.S. ——, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986); *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). These two kinds of due process claims are known as due process "simpliciter" claims, since the source of these rights is found solely in the due process clause itself.

The third category of due process claims invokes the fourteenth amendment in its capacity as the vehicle for the incorporation of other specific constitutional protections. In the case at bar, plaintiff alleges a violation of the eighth amendment's prohibition of cruel and unusual punishment. *See, e.g., Bacon v. Patera*, 772 F.2d 259 (6th Cir.1985).

At the outset, the Court is mindful of the appropriate standard to be used in consid-

ering defendants' motion. In addition to various supplemental authority provided by the parties during the pendency of this motion, plaintiff has also attached several affidavits, memoranda, and other documents which, if considered by the Court, would effectively transform defendants' motion to dismiss under Rule 12(b)(6) into a motion for summary judgment under Rule 56. The Court is vested with wide-ranging discretion in determining the appropriateness of such a transformation. Fed.R. Civ.P. 12(b)(6) advisory committee note; *Stein v. United Artists Corp.*, 691 F.2d 885, 889 (9th Cir.1982). Extra-pleading material which is comprehensive and will enable a rational determination of a summary judgment motion is likely to be accepted; scanty or incomplete material should be rejected. 5 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1366 (1968).

In this case, defendants have purposely brought a motion to dismiss in order to avoid the necessity of extended discovery. If the Court were to consider the limited material provided by the plaintiff outside the actual pleadings, the economy of a motion to dismiss would be defeated. Since it is likely that the resolution of the issues raised by plaintiff in this case would require extensive discovery, the Court finds it premature to consider the limited extra-pleading material currently before it. As a result, the issues before the Court shall be decided purely upon a determination of the sufficiency of plaintiff's complaint in the context of a Rule 12(b)(6) motion to dismiss.

## A. Legal Standard

Conceptually, procedural due process involves a balance between the protections due one whose rights are limited by the state and the state's interest in creating the limitation. Substantive due process involves those inalienable rights which may not be invaded regardless of the competing interests involved. Plaintiff alleges both of these kinds of due process simpliciter claims. Her third due process claim involving the eighth amendment will be considered at a later point in this opinion.

The Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), provides the most recent authoritative consideration of these due process issues. There, the Court determined that the plaintiff, an involuntarily committed patient, had a substantive due process right to reasonably safe conditions, freedom from unreasonable bodily restraints, and such minimally adequate training as reasonably might be required to preserve these interests. *Id.* at 316, 322, 102 S.Ct. at 2458, 2461. The Court noted that the analytical approach in determining the extent of both substantive and procedural due process rights is similar. The liberty interest of the individual must be weighed against the legitimate interests of the state, including the fiscal and administrative burdens additional procedures would require. *Id.* at 321–22, 102 S.Ct. at 2461. Judicial review of medical decisions in this context is limited: "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. at 2462.

The reasoning behind the Court's "professional judgment" standard is obvious. Showing deference to the judgment of qualified professionals limits the interference of the judiciary with the internal operations of these institutions. A professional, in the context of mental institutions such as the TMHC, is by definition better qualified to make such decisions than a court. In addition, the decision-making of such professionals should not be made to operate beneath the dark cloud of impending legal challenges; difficulties in dealing with often intractable problems in such environments should not be unduly exacerbated.

## B. Defenses

### 1. Good Faith Immunity

Defendants argue against the application of *Youngberg* because it was decid-

ed after the operative events herein. This being the case, defendants argue, the principle of good faith immunity operates to shield defendants from liability.

The good faith immunity to which defendants refer received its initial formulation in *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975):

> [W]e hold that a school board member is not immune from damages under § 1983 if he knew or reasonably should have known that the action he took within the sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student.

*See also Procunier v. Navarette,* 434 U.S. 555, 562–63, 98 S.Ct. 855, 859–60, 55 L.Ed.2d 24 (1978) (*Wood* formulation may be read as a generalized statement of the qualified immunity standard). This principle was expanded and clarified in *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), wherein the Supreme Court modified *Wood*'s test for qualified immunity which included both subjective and objective elements, to a strictly objective test: "We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

What constitutes the "clearly established" constitutional law in the instant case is a question on which plaintiff and defendants differ. Defendants in particular insist that only the law as established in the Northern District of Ohio, the Sixth Circuit, and the Supreme Court may be considered. While this argument has merit in its simplicity, it is not at all clear that this is the applicable standard within the Sixth Circuit. In *Davis v. Mansfield Metropolitan Housing Authority,* 751 F.2d 180, 187 (6th Cir.1985), for example, the

Court cited several other circuits and district courts in supporting its conclusion that the law relevant in that case had been clearly established. Regardless of the outcome of this particular issue, however, this Court is convinced that the law, even as limited by defendants, was clearly established regarding the rights plaintiff claims were violated by defendants.

First, the Supreme Court's decision in *Youngberg* which clearly established the rights at issue herein was published on June 18, 1982. At that time, plaintiff, according to her complaint, had been in Lucas County Jail for approximately one month and remained there another four months as a result of the filing of criminal charges by defendants against plaintiff. Since it was presumably within the power of defendants to drop the charges against plaintiff at any time, in which case she would have been transferred back to their direct custody, there is no merit to the claim that defendants' responsibility for plaintiff ended upon her incarceration in Lucas County Jail.

Second, several previous cases in this Court have discussed and applied some of the rights alleged in plaintiff's complaint several years before the activities alleged in the complaint. *See, e.g., Rone v. Fireman,* 473 F.Supp. 92 (N.D.Ohio 1979); *Davis v. Watkins,* 384 F.Supp. 1196 (N.D.Ohio 1974). Defendants take a hypertechnical position with regard to the applicability of these latter cases, asserting that the distinction between the involuntarily committed patients in *Rone* and *Davis* and the voluntary commitment of plaintiff in the case at bar makes them an insufficient basis on which to hold that the law was clearly established. Defendants' neat "quid pro quo" analysis—that it is only the involuntary nature of the initial commitment that gives rise to the due process rights at issue—fails to account for practical realities surrounding the commitment of one such as plaintiff who has been under the care of state institutions since age ten. *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), provides some insight into the Supreme Court's thinking

regarding a child's "voluntary" committal to a state institution at the instance of his parents. There, the Court held that, while parents retain a substantial role in the commitment decision, the child's rights nonetheless require at least a staff physician's input based upon an independent evaluation before the child may be committed. *Id.* at 604, 99 S.Ct. at 2505. The Court minimized the distinction between a child's rights when he is represented by his natural parents and when the state seeks to have him committed. *Id.* at 617–18, 99 S.Ct. at 2511–12. This reasoning was noted in *Philipp v. Carey*, 517 F.Supp. 513 (N.D.N.Y.1981), wherein the court stated that "[t]he recognition of a right to treatment for voluntarily admitted individuals is one way to assure that continued physical custody by the State does not wrongfully, or permanently, interfere with fundamental liberty interests like personal autonomy and bodily integrity." *Id.* at 519.

Additional Supreme Court guidance on this issue may be found in *Youngberg, supra.* As noted previously, this case recognized several rights of residents of mental institutions, although the plaintiff's status in that case was cast as an involuntary admittee. The circumstances surrounding the admission, however, were very similar to those of the instant case: plaintiff lived with his parents until he was 26 years old, at which time his father died. Plaintiff's mother was thereafter unable to care for him, and sought his admission to a state institution. Plaintiff was admitted pursuant to the state procedure for involuntary commitments. Thus, while the plaintiff in *Youngberg* was at all times considered an involuntary resident, the similarities between the circumstances of admission there and in the case at bar indicate that in many cases, the voluntary/involuntary distinction is largely a semantic administrative one. *See Lombard v. Eunice Kennedy Shriver Center*, 556 F.Supp. 677, 679 n. 3 (D.Mass. 1983) (noting similar commitment circumstances between that case and *Youngberg*, and stating that plaintiff "was at all relevant times a person without the will or

power independently to pursue his interests and assert his rights").

Cumulatively, these cases illustrate the policy and practical considerations which minimize, if not completely eliminate, the operative distinction between a resident of a mental institution who is voluntarily or involuntarily committed when due process rights are at issue. This is especially true in the instant case, where plaintiff is alleged to be a retarded and mentally ill individual who has been institutionalized since she was ten years old. It is highly unlikely that plaintiff, either at the time of her initial admission or throughout her journey through Ohio's mental health system, had the capacity to choose voluntarily any reasoned course. One court has likened "voluntary" admittees such as plaintiff to de facto prisoners: "A voluntary patient ... is legally not forced to endure the conditions [of the institution] although, depending on his degree of disability, the availability of other resources and of parents, spouses, friends and guardians, and so on, he may or may not be compelled *de facto* to endure the conditions." *Harper v. Cserr*, 544 F.2d 1121, 1123 (1st Cir.1976).

Here, the complaint gives no hint that plaintiff had any alternative to her complete dependence on the state for her needs. As a result, defendants' argument that the voluntary/involuntary distinction is dispositive of the issue has no merit.

Therefore, defendants' reliance on good faith immunity is misplaced. Since the law giving rise to the rights at issue here was clearly established when some or all of the operative events occurred herein, and the complaint alleges violations of these rights, the good faith immunity defense must fail at this stage of the proceedings.

### 2. *Parratt v. Taylor*

A second defense raised by defendants contends that the Supreme Court's decision in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), warrants dismissal of plaintiff's due process claims. *Parratt* involved a § 1983 action brought by an inmate as the result of the loss by prison officials of the plaintiff's

mail order hobby materials. The Court held that despite the fact that plaintiff had been deprived of his property, he nonetheless could not maintain an action for violation of his due process rights because the state provided a meaningful postdeprivation remedy. Such a procedure was the only practical method available to correct the "random and unauthorized" actions of the state officials in that case. *Id.* at 540–41, 101 S.Ct. at 1915–16. While some question remained whether the Court's analysis applied to deprivations of liberty as well as property interests, 451 U.S. at 545, 101 S.Ct. at 1917 (Blackmun, J., concurring), the Sixth Circuit recently ruled that *Parratt's* rationale in support of the adequacy of postdeprivation remedies—the unpredictability of random and unauthorized actions—could not support a distinction between deprivations of property and liberty interests. *Wilson v. Beebe,* 770 F.2d 578, 584 (6th Cir.1985) (en banc).

*Wilson* accomplished more, however, than simply resolving the issue of the applicability of *Parratt* to deprivations of liberty interests. The Sixth Circuit's holding also implicitly overruled another Sixth Circuit case upon which defendants herein rely heavily. *Wilson* explicitly focused on the "random and unauthorized" language of the Supreme Court in *Parratt* in reaching its conclusion. In so doing, the court limited the holding of *Campbell v. Shearer,* 732 F.2d 531 (6th Cir.1984) despite no reference to this latter case in *Wilson.* *Campbell,* a split decision, held that the plaintiff's failure to plead and prove any deficiency in the state's corrective procedure for improper seizure of money from his home resulted in an inability to satisfy the due process element of his § 1983 action. The majority made no reference to *Parratt's* "random and unauthorized" rationale, leading the dissent to object to the majority's unwarranted extension of *Parratt* to include systematic and preventable intrusions on due process rights. Such a broad holding, according to the dissent, "would effectively eliminate section 1983 actions based upon a deprivation of property without procedural due process." 732 F.2d at 538 (Holschuch, J., dissenting).

In the case at bar, defendants argue that *Campbell,* combined with *Wilson's* extension of *Parratt* to include deprivations of liberty interests, requires the Court to dismiss plaintiff's claim because state remedies would be adequate to make her whole. This reasoning overlooks the sub silentio overruling of *Campbell* by *Wilson.* Defendants' argument is defeated by allegations in the complaint which indicate that defendants' actions were not random and unauthorized, but rather a systematic, intentional course of action which could have been addressed by *predeprivation* due process protections.

The intentional nature of defendants' conduct alleged by plaintiff takes this case outside the recent Supreme Court qualification of *Parratt* found in *Daniels v. Williams,* —— U.S. ——, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), which overruled *Parratt's* holding to the extent it implied that a § 1983 action could be based upon merely negligent behavior. *Daniels* makes clear that the Constitution was not meant to be trivialized to the point that negligent behavior by itself can support a constitutionally based cause of action. 106 S.Ct. at 665. Since the complaint herein alleges intentional acts by defendants, *Daniels'* limitation of *Parratt* is irrelevant to the instant case. Consequently, defendants' argument based on *Parratt* is not well taken.

### 3. Respondeat Superior

■ Defendants also contend that the claims raised by plaintiff as to certain of them must be dismissed because a defendant cannot be held liable in a § 1983 action strictly on the basis of a respondeat superior theory. While this is true as a general proposition, it does not provide a basis for dismissal at this stage of the case at bar. Supervisory officials may be deemed liable for constitutional violations that result from their departmental policies, customs, and usages. *Monell v. Dept. of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). The

Sixth Circuit has held that this principle extends to a pattern of misconduct in which supervisory officials acquiesced. *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir.1982).

Plaintiff's complaint makes allegations sufficient to infer the kind of conduct made actionable in *Hayes.* Without further development of the facts, it is impossible to tell whether the distinctions made by defendants regarding medical and administrative responsibilities are of any significance. Consequently, defendants' respondeat superior defense must fail at this stage of the case.

## C. Sufficiency of Complaint under *Youngberg*

■ Having considered the threshold defenses, it remains to determine whether plaintiff's complaint actually states a claim that her procedural and substantive due process rights were violated. As noted previously, *Youngberg, supra,* provides the standard by which to evaluate plaintiff's due process claims. If the decisions made by defendants in this case represent such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that those responsible actually did not base their decision on such a judgment, then they may be liable. 457 U.S. at 323, 102 S.Ct. at 2462. In the context of defendants' motion to dismiss, the Court is convinced that plaintiff's complaint makes sufficient allegations regarding her due process simpliciter claims to withstand the motion.

The strong deference due the "professional judgment" standard frequently results in dismissal in this type of case. It is clear from plaintiff's complaint, however, that those matters of which she complains do not address themselves solely to professional judgment regarding the appropriate treatment of plaintiff balanced by legitimate concerns of the welfare of the institution as a whole. Rather, they can be read as alleging the defendants based decisions on administrative convenience at the expense of plaintiff's well-being.

Plaintiff alleges that defendants, in conscious disregard of a court order and resulting executive order, refused to place plaintiff in the dual diagnostic ward at TMHC. Further, the complaint contains allegations that plaintiff received antipsychotic medications despite the fact that defendants knew plaintiff was not psychotic. Finally, the complaint alleges that the defendants implemented a conscious policy to press criminal charges against residents arising out of their behavior at TMHC. This policy allegedly led to the arrest of plaintiff followed by her incarceration in Lucas County Jail where defendants knew she would not receive the treatment she needed, despite plaintiff's alleged inability to form the necessary criminal intent.

It is difficult to imagine that these actions would arise out of the exercise of considered professional judgment. Rather, considering the complaint in the light most favorable to the plaintiff, the allegations more closely resemble decisions which were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462. As a result, plaintiff's due process simpliciter claims state valid causes of action, and defendants' motion to dismiss shall be denied as to these claims.

## D. Eighth Amendment

■ A different analysis applies to plaintiff's eighth amendment claim. In *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), the Supreme Court refused to extend the protections of the eighth amendment to ban the paddling of school children, but suggested that the amendment might be applicable to those involuntarily confined in juvenile or mental institutions. *Id.* at 669 n. 37, 97 S.Ct. at 1411. The Court, however, retreated from this suggestion in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979):

This court, however, is of the opinion that the Supreme Court's decision in *Bell v. Wolfish* has laid to rest the question

left open in *Ingraham.* In *Bell,* the Court held that the Eighth Amendment does not govern the confinement of pre-trial detainees because of the absence of a formal adjudication of guilt. *Id.* at 535 n. 16, 99 S.Ct. at 1872 n. 16. Insofar as the Court chose not to extend the protections of the Eight Amendment to fully incarcerated, pre-trial detainees, no principled basis would appear to justify an extension of the Eighth Amendment to the situation of civilly committed, institutionalized mentally retarded persons. *Philipp v. Carey,* 517 F.Supp. 513, 517 (N.D.N.Y.1981).

The Sixth Circuit has taken a similarly narrow view of the issue. In *Bacon v. Patera,* 772 F.2d 259 (6th Cir.1985), the court noted that "[m]ost eighth amendment claims have involved the constitutionality of state treatment for individuals already convicted of crimes." *Id.* at 264. In light of the relatively narrow scope given the eighth amendment, it would be inappropriate for the Court to extend its reach to the facts raised by plaintiff's complaint. Plaintiff's eighth amendment due process claim shall accordingly be dismissed.

### III. Pendent Jurisdiction

Having determined that two of the three federal claims raised in plaintiff's complaint survive defendants' motion to dismiss, the Court now considers whether to exercise pendent jurisdiction over the state claims raised by plaintiff. The Supreme Court's decision in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), provides the starting point for determining whether, under Article III, a federal district court can exercise jurisdiction over state claims appended to a federal claim. First, the federal claim must be of sufficient substance to confer jurisdiction. Second, the federal and state claims must arise out of a "common nucleus of operative fact [which the plaintiff] would ordinarily be expected to try ... in one proceeding...." *Id.* at 725, 86 S.Ct. at 1138. If these two constitutional tests are met, the Court must examine the statute on which federal jurisdiction is predicated "in

order to determine whether 'Congress in [that statute] has ... expressly or by implication negated' the exercise of jurisdiction over the particular nonfederal claim." *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 373, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978) (quoting *Aldinger v. Howard,* 427 U.S. 1, 18, 96 S.Ct. 2413, 2422, 49 L.Ed.2d 276 (1976)). Once these questions regarding the power of the Court to hear state claims are answered, exercise of this power is committed to the informed discretion of the Court.

■ Discretion to dismiss state claims should be exercised: 1) when considerations of judicial economy, convenience, and fairness to litigants are not present; 2) when a surer-footed reading of applicable state law can be obtained in state court; 3) when state issues predominate in terms of proof, scope of issues raised, or comprehensiveness of remedies sought; and 4) when divergent state and federal claims are likely to cause jury confusion. *Ritter v. Colorado Interstate Gas Co.,* 593 F.Supp. 1279, 1283 (D.Colo.1984) (citing *Gibbs,* 383 U.S. at 726–27, 86 S.Ct. at 1139).

■ In the instant case, one of the threshold issues regarding the power of the Court is seriously at issue. Defendants argue that the common nucleus of operative fact is lacking regarding some or all of the state claims. While this argument has some merit, it is not by itself adequate to deprive the Court of its power to hear the state claims. In making this argument, defendants take a narrow view of what constitutes a common nucleus of operative fact. While at least one court has recently found this interpretation attractive, *see Mason v. Richmond Motor Co.,* 625 F.Supp. 883 (E.D.Va.1986), the standard applicable in most circuits is that a loose factual connection will satisfy the common nucleus test. It is not necessary for the Court to decide this issue, however, because even assuming the Court has the power to hear the state claims, it is abundantly clear that its discretion to do so should not be exercised in this case.

Application of the above mentioned factors demonstrates the wisdom of dis-

missing the state claims from this case. The primary balance to be drawn when weighing the considerations of judicial economy, convenience, and fairness is the degree to which the state claims may complicate the trial measured against the burden placed upon the plaintiff by forcing her to bring the state claims in a state forum. The Court has received no enlightenment from the parties regarding this latter burden, but it is clear that the various state claims in plaintiff's complaint would complicate significantly the already complex due process issues which survive defendants' motion to dismiss. To expect even a conscientious jury to grapple with five additional diverse state claims as well as the constitutional claims asks too much. The resulting potential for jury confusion is more than theoretical. In addition, the state claims, if all were tried in this action, would predominate over the federal claims. For all of these reasons, the Court refuses to exercise its discretion to hear the state claims raised by plaintiff.

A final note regarding plaintiff's state claims of false arrest and false imprisonment is appropriate at this point. These claims are most frequently considered state tort causes of action, and nothing in the complaint suggests that plaintiff raises them as anything other than state claims. In her response to defendants' motion to dismiss, however, plaintiff asserts that these claims are independently cognizable § 1983 causes of action. In the circumstances of this case, the Court disagrees. Such claims would fall, if anywhere, under the protection of the fourth amendment made applicable to the states via the due process clause of the fourteenth amendment in the same manner as plaintiff's eighth amendment claim herein. A claim of this nature is properly plead with greater specificity in the body of the complaint rather than as an apparent afterthought in plaintiff's brief.

Second, and more importantly, the positions of the defendants herein are not such that they lend themselves to a charge of a violation of the fourth amendment. In the context of a § 1983 action, false arrest/false imprisonment claims are general-

ly directed against state officials with traditional arrest powers, such as police. While no claim has been made that defendants are not state actors, their functions are significantly different from those who are most commonly amenable to these claims. The probable cause determination of which plaintiff complains would have been made by the arresting officer. As the complaint now reads, any action by the defendants in connection with such officer's incorrect determination of probable cause is more related to plaintiff's other surviving due process claims than to any claim of false arrest and false imprisonment in violation of the fourth amendment. As a result, plaintiff's claims under these headings relate strictly to state law, and are subject to dismissal from this case along with the other state claims in the exercise of the Court's discretion to refuse to hear the pendent claims.

Therefore, it is

ORDERED that defendants' motion to dismiss is granted as to the eighth amendment claim of cruel and unusual punishment and all state causes of action.

FURTHER ORDERED that defendants' motion to dismiss is denied as to those claims brought pursuant to the due process clause of the fourteenth amendment simpliciter.